745 N.W.2d 299 (2008)
275 Neb. 112
David G. SHOEMAKER, Trustee of the Marion P. Shoemaker Revocable Trust, and Harley G. Shoemaker, Trustee of the Harley G. Shoemaker Revocable Trust, appellants,
v.
Don SHOEMAKER and Yvonne Shoemaker, appellees.
No. S-06-319.
Supreme Court of Nebraska.
February 22, 2008.
*302 V. Gene Summerlin, Mamie A. Jensen, and Justin Firestone, of Ogborn, Summerlin & Ogborn, P.C., Lincoln, for appellants.
Mark A. Christensen and Andre R. Barry, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., Lincoln, for appellees.
HEAVICAN, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
CONNOLLY, J.
This appeal presents two main issues. The first is whether a partnership is dissolved by operation of law under the Uniform Partnership Act of 1998 (the 1998 UPA) when a partner voluntarily withdraws.[1] The second is whether the parties intended the partnership to dissolve if the remaining partners failed to timely pay the buyout price for the withdrawing partner's interest. Briefly stated, we hold that under the 1998 UPA, a partner's voluntary withdrawal does not dissolve a partnership if the parties intended the business to continue. We further conclude that the parties intended the business to continue and did not intend the partnership to dissolve if the remaining partners failed to timely pay the buyout price for a withdrawing partner's interest. Accordingly, we affirm.

I. SUMMARY OF THE CASE
This action arose from a partnership dispute between two brothers, Don Shoemaker *303 and Harley G. Shoemaker, and their wives. Each of the four partners owned an equal share of the partnership, D & H Real Estate (D & H). After Harley and his wife, Marion Shoemaker, gave notice that they were withdrawing from D & H, the partners failed to agree on the buyout price of Harley's and Marion's interests. Harley, as trustee of his own trust, and their son David G. Shoemaker, as the trustee of Marion's trust, later sought an accounting and an order compelling D & H to wind up and terminate its business. Harley and David claimed that D & H was already in dissolution once the remaining partners failed to pay the buyout price within the time specified by the partnership agreement.
The remaining partners, Don and his wife, Yvonne Shoemaker, counterclaimed for breach of contract. They claimed that Harley and Marion failed to complete an appraisal process in the partnership agreement for determining the buyout value of their interests. They also claimed that Harley and Marion continued to negotiate past the buyout deadline and were estopped from claiming that Don and Yvonne had breached the agreement.
Each couple acted in unison. So, unless otherwise necessary to explain the background facts, we will refer to Harley and David, Marion's trustee, as "Harley", and Don and Yvonne as "Don." The district court agreed with Don. It concluded that Harley was estopped from claiming that Don had breached the agreement by failing to comply with the buyout deadline. It also concluded that. Harley had breached the agreement by failing to comply with the appraisal process. Finally, the court applied part of the partnership's distribution of earnings to Harley toward the purchase price of his interest in the partnership.

II. BACKGROUND

1. PARTNERSHIP AGREEMENT
In 1984, Don and Harley created D & H by oral agreement. The partnership's assets included 24 acres with improvements west of Lincoln and the right to collect rent from tenants. Harley and David owned Shoemaker's Truck Station, Inc., a truckstop and restaurant on the property. When Don and Harley created D & H, the partnership leased part of the property to the truckstop for 5 years and gave the truckstop the right to renew the lease for 4 additional terms of 5 years. At all relevant times, the truckstop was a tenant. In 1987, the partnership entered into a 99-year lease with Don on another part of the property. The parties stipulated that Don's son and daughter-in-law owned a motel on this property.
In September 1989, Don and Harley signed a written partnership agreement for D & H. Don and Harley each had a 50-percent interest in D & H. The following sections are relevant:
Section 3. Term of Partnership
The partnership commenced by oral agreement on the 1st day of July, 1984, and shall continue until dissolved by mutual agreement or by the terms of this agreement.
. . . .
Section 11. Dissolution or Termination of the Partnership
a. Any partner may withdraw or retire from the partnership upon 90 days prior notice to the remaining partner(s);
b. The death or legal incapacity of a partner, shall immediately terminate the interest of such deceased or legally incapacitated partner in future partnership profits or losses;
c. In the event of the withdrawal [or] retirement . . . of a partner, the remaining partner(s) shall have the right to *304 continue the business of the partnership themselves or in conjunction with any other person or persons they may select, but they shall pay to the retiring partner. . . the value of such partner's interest in the partnership as provided in the following section.
Section 12. Valuation of Partnership Shares
The value of the interest of a withdrawing [or] retiring . . . partner, as of the date of such withdrawal [or] retirement. . . shall be determined in the following manner. In the event that the remaining partner(s) and the . . . retiring partner are unable to agree upon the value to be assigned to the partnership shares, all interested individuals shall select an appraiser and in the event they are not able to agree upon an appraiser, the remaining partner(s) and the . . . retiring partner shall be entitled to select an appraiser with the appraisers separately submitting their appraisals. If the appraisals are within ten percent of each other[,] the value shall be an average of the two appraisals. If the difference in the appraisals exceeds ten percent[,] the two appraisers shall together attempt to reach agreement on the value and if unable to do so shall obtain a third appraiser with the three appraisers together agreeing upon the value. The appraisers shall determine the value of the partnership as a going concern with all assets to be valued Cit, their fair market value.
Section 13. Payment Upon Dissolution or Termination
The value of the partner's interest as determined in the above section shall be paid without interest to the withdrawing or retiring partner . . . not later than 90 days after the effective date of the dissolution or termination.
Section 14. Termination and Liquidation
In the event the remaining partner(s) do not elect to purchase the interest of the retiring, deceased or legally incapacitated partner, or in the event the partners mutually agree to dissolve the partnership, the partnership, shall terminate and the partners shall proceed with reasonable promptness to liquidate the business of the partnership.
In December 1992, Don and Harley each assigned half of their partnership interest to their wives.

2. HARLEY'S WITHDRAWAL FROM PARTNERSHIP
On September 19, 2001, Harley sent Don a letter and stated that he was withdrawing from the partnership: "Therefore, pursuant to Section 11[a] of the Partnership Agreement . . . this letter constitutes notice that we withdraw from the partnership effective 90 days after the date of this notice." Don retained attorney Peter Katt, and Harley retained Alan Slattery.
On October 1, 2001, Katt e-mailed Slattery that he would respond to Harley's letter within 30 days. On October 30, Katt wrote Slattery that section 12 of the agreement, regarding the appraisal of a withdrawing partner's interest, applied only if the partners did not agree on the value of the interest. He stated that the parties should attempt to agree on the value before selecting an appraiser. On November 1, Slattery responded that the appraisal process in section 12 applied only if Don elected to continue the business by December 20, 2001, the effective date of Harley's withdrawal. He further stated that if Don made that election, Harley would participate in the valuation process. But if Don failed to elect to continue the business by December 20, then D & H would be dissolved.
*305 On November 9, 2001, Katt wrote Slattery that he agreed Harley's withdrawal was effective December 20. He also agreed that if Don did not elect to purchase Harley's interest, then section 14 of the agreement applied regarding termination and liquidation of D & H. He stated Don would advise Harley whether he elected to purchase Harley's interest by December 15, "provided [Harley' provides us with a value for his interest on or before December 1, 2001." Katt also suggested moving the effective date to December 31 for accounting and tax purposes.
On November 14, 2001, Katt and Slattery met to discuss the value of Harley's interest and the possibility of Harley's purchasing Don's interest instead. On November 28, Harley offered to purchase Don's interest for $1.15 million. On December 6, responding to an inquiry from Slattery, Katt e-mailed Slattery. He stated he was working on a "`business continuation" proposal and that he was still waiting for a response to his suggestion that the parties extend the deadlines under the agreement. The next day, Slattery responded that he would not "extend any deadlines unless the parties have made all agreement, or if it appears the parties are likely to reach an agreement." On December 13, Katt wrote Slattery that Don was declining Harley's offer to purchase Don's interest and that Don was electing to continue the business. Katt stated that although Harley's offer had been based on an appraiser's fair market value of D & H, selling would cause Don a substantial loss of annual income. Katt again asked for the price that Harley would be willing to accept for his 50-percent interest.

3. BUYOUT PERIOD
After Don elected to continue the business, Harley continued to pursue purchasing Don's interest until January 18, 2002, when it was clear that Don would not sell. On January 24, Harley agreed to sell his interest for $1.75 million. For this price, he would allow D & H to amend the lease agreement with the truckstop so that D & H would not be obligated to pay for improvements when the lease ended. In February, Don asked for tax returns and a list of improvements Harley believed belonged to the truckstop and not to the partnership. On March 12, Harley provided depreciation schedules for 1999 and a list of the improvements that belonged to the truckstop. But the schedules only showed original costs and did not include depreciation or amortization. On the same day, Slattery e-mailed that he would provide more current information when he received it from Harley.
On March 28, 2002, Katt wrote that Don agreed to pay Harley $1.25 million for his interest. Katt further stated that Don was operating under a belief that the effective date of Harley's withdrawal was December 31, 2001. On April 3, Slattery wrote that Harley rejected Don's offer. Slattery stated: "Based on the apparent inability of the parties to agree upon the value of the interest to be sold, and pursuant to Section 12 . . . all parties are to select an appraiser."

4. APPRAISAL PERIOD
The parties continued to make offers and counteroffers in May 2002 but failed to agree. From May to July 10, the parties unsuccessfully attempted to create a joint set of instructions for appraisers. In July, the parties instructed their separate appraisers. Sometime between August 27 and October 1, the appraisers met with Don and Harley to decide what items the partnership owned. On October 1, Don's appraiser determined the retrospective value of the partnership's "`leased fee estate'" *306 was $2.66 million. On October 11, Harley sued Don, and on October 18, he instructed his appraiser to suspend work.

5. COMMUNICATIONS WHILE LAWSUIT WAS PENDING
On October 25, 2002, Don informed Harley that he was ready to close on short notice once, Harley's appraiser had reached a valuation. On November 20, Don offered to purchase Harley's interest based on Don's appraisal. He stated that if Harley did not respond by the end of November, Don would consider his failure an intent to breach the agreement. Two days later, Harley responded that Don's "efforts to now perform the Agreement, months after such performance was due, are very telling," and that "rather than try to resurrect a dead Agreement," they should "both devote our time to getting the pending lawsuit decided."
In February 2003, Harley assigned his 25-percent interest to the Harley G. Shoemaker Revocable Trust, and Marion assigned her 25-percent interest to the Marion P. Shoemaker Revocable Trust. Marion died in July 2003. As noted, their son David is the trustee of Marion's trust; Harley is the trustee of his trust. The parties stipulated that during the pendency of the lawsuit, Harley and Marion or their trusts continued to receive "earnings" from the partnership. (The parties* use of the term "earnings" in their stipulation apparently refers to the partnership's profit distributions.) Don claimed that the court should apply, these payments toward the buyout price for Harley's interest. From December 20, 2001, to December 31, 2005, the partnership paid to Harley and Marion or their trusts $570,180, representing 50 percent of truckstop earnings, and $14,540, representing 50 percent of motel earnings.

6. PARTIES' ALLEGATIONS
In Harley's January 2005 amended complaint, he alleged that D & H was in dissolution. He asked that D & H be wound up and terminated. He claimed that Don failed to elect to continue the business when he failed to pay for Harley's interest by March 20, 2002, or within 90 days after Harley's withdrawal was effective. Don answered that he had tendered payment under the agreement but that Harley had refused to accept payment. Don also alleged that by his conduct, Harley had modified the agreement, to eliminate the requirement that payment be made within 90 days, had waived that right, or was estopped from claiming that Don had breached the agreement by failing to pay for Harley's interest within 90 days. Don counterclaimed that Harley had breached the agreement by refusing to complete the appraisal process and prayed for specific performance. He requested the court to transfer Harley's interest at the price determined by Don's appraiser or to require Harley to complete his own appraisal.

7. DISTRICT COURT CONCLUDES PARTNERSHIP IS NOT DISSOLVED AND ORDERS HARLEY TO COMPLETE APPRAISAL
The district court found that Harley had negotiated in good faith but had caused Don to rely on his continued negotiations past the buyout deadline. The court concluded Harley did not intend to complete the valuation process. The court found that all the elements of equitable estoppel were satisfied. The court also found that the parties had modified the agreement on the buyout deadline by continuing to negotiate. On the counter-claim, the court found that Harley had breached the agreement by failing to complete the appraisal process and ordered him to complete that process within 60 days. Harley appealed, but the Court of Appeals dismissed for *307 lack of jurisdiction.[2]

8. DISTRICT COURT VALUES HARLEY'S INTEREST AND APPLIES PART OF HARLEY'S "EARNINGS" TOWARD PURCHASE PRICE OF HIS INTEREST
On remand, the district court ordered Harley to complete his appraisal by July 29, 2005. Afterward, the court ordered the parties' appraisers to reach an agreement on the partnership's value because there was more than a 10-percent difference in their valuations. Don's appraiser valued the partnership at $2.66 million, and Harley's appraiser valued it at $2.285 million. In setting the value, the appraisers agreed on $2.35 million. The court determined that the appraisers had properly valued the partnership based on its leased fee value and accepted their agreed-upon valuation.
In January 2006, the court heard arguments on whether the partnership's distributions of "earnings" to Harley and Marion or their trusts constituted profit distributions or payments toward the buyout price for Harley's interest. Harley argued that the payments were profit distributions because Don had not purchased his interest or, alternatively, that he was entitled to interest. The court concluded that the parties had negotiated in good faith until October 2002. But it determined that if Harley had not breached the agreement by failing to complete the appraisal process, Don would have purchased Harley's interest by late 2002. The court further determined that Don did not have to pay interest to Harley; the court reasoned that interest would only be required if the remaining partners had refused to pay Harley the value of his partnership interest, which had not occurred. It ruled that Harley's interest was $1.175 million. It further ruled that the partnership's distributions of earnings after December 31, 2002, $431,206.98, applied to the buyout price of Harley's interest. Finally, it ruled that Don did not owe interest because he had not refused to pay the buyout price and because the partnership agreement provided that no interest was to be paid.

III. ASSIGNMENTS OF ERROR
Harley assigns, restated, that the district court erred in concluding that (1) the partnership was not in dissolution when Don failed to pay for Harley's interest within the 90-day time limit and (2) Harley lost his right to enforce the partnership agreement through one of the following theories: waiver, equitable estoppel, implied modification, bad faith dealing, or breach of the agreement. Harley alternatively assigns that if the partnership was not in dissolution, then the court erred by applying part of his earnings toward the purchase price of his interest and in determining the amount Don owed to Harley for his interest.

IV. STANDARD OF REVIEW
An action for a partnership dissolution and accounting between partners is one in equity and is reviewed de novo on the record.[3] On appeal from an equity action, we resolve questions of law and fact independently of the trial court's determinations:[4] But when credible evidence is in conflict on material issues of fact, we consider and may give weight to the fact the trial court observed the witnesses and accepted *308 one version of the facts over another.[5]
Statutory interpretation presents a question of law.[6] The interpretation of a partnership agreement presents a question of law.[7]

V. ANALYSIS

1. Applicability and Effective Date of the 1998 UPA
Generally, the parties agree that the partnership agreement governs whether the partnership was dissolved. Nonetheless, the parties at times rely on the 1998 UPA,[8] and the act is relevant. So, in our analysis, we will be focusing on the interplay between the 1998 UPA and the partnership agreement
In the 1998 UPA, the Legislature set a termination date for the original Uniform Partnership Act (the original UPA)[9] and adopted the subsequent model act that is commonly called the Revised Uniform Partnership Act (RUPA).[10] Thus, the 1998 UPA is Nebraska's counterpart to RUPA. Sections 67-464 and 67-466 provide that after January 1, 2001, the 1998 UPA shall apply to any Nebraska partnership, including those formed before January 1, 1998. The original UPA provisions terminated on January 1, 2001.[11]
Here, the relevant events occurred after the effective date of January 1, 2001, so the 1998 UPA unquestionably governs the parties' dispute although they formed their partnership in 1989.[12]

2. EFFECT OF HARLEY'S WITHDRAWAL AND DON'S FAILURE TO TIMELY PAY THE BUYOUT PRICE FOR HARLEY'S INTEREST

(a) Parties' Contentions
Although the parties rely on the partnership agreement; they disagree on the effect of Don's failure to purchase Harley's interests before the 90-day time limit expired in section 13 of the agreement. Don contends that under the plain language of the partnership agreement, his failure to pay Harley within 90 days did not dissolve the partnership. Don also argues that the agreement did not provide time was of the essence. He contends that he offered to purchase Harley's interest within a reasonable time because Harley was attempting to purchase Don's interest during part of the 90-day period. He also points out that Harley's attorney had stated an appraisal was necessary after Harley rejected Don's buyout offer. Don alternatively argues that Harley modified the time limit or waived his right to enforce it by continuing to negotiate the buyout price. Finally, he argues that even if he breached section 13 by failing to pay the buyout price within *309 90 days, Harley's remedy was specific performance.
Of course, Harley views the matter differently, but we believe Harley's arguments are inconsistent. Harley primarily asserts a contract interpretation argument. He contends that because Don failed to comply with the 90-day time limit under section 13 of the agreement, Don did not elect to purchase Harley's interest under section 14-one of the events triggering dissolution and termination under section 14. Harley also asserts statutory arguments under the default rules of the 1998 UPA. First, he contends that under the 1998 UPA, a partner's voluntary withdrawal from an at-will partnership results in mandatory dissolution and winding up of the partnership. Second, he argues that under the original UPA, courts will not enforce "anti-dissolution" provisions that avoid automatic dissolution unless the remaining partners strictly comply with the provision.[13] He implicitly contends that RUPA similarly requires strict compliance. We first address Harley's statutory argument regarding mandatory dissolution for a partner's voluntary withdrawal.

(b) 1998 UPA's Effect on Voluntary Withdrawals
We believe Harley misconstrues RUPA's effect on partnership law. He contends that the partnership was in dissolution under the 1998 UPA because Don failed to strictly comply with the buyout provision. Under the original UPA, dissolution of an at-will partnership was mandatory upon a partner's expressed will to dissolve the partnership.[14] "Unless otherwise agreed," the partners who had not wrongfully dissolved the partnership had the right to wind up the partnership affairs.[15] The partnership was terminated once the winding up of its affairs was completed.[16]
Although dissolution was mandatory, the partners could agree to prevent termination of the business.[17] But problems arose with third parties and partnership property that partnership agreements could not prevent.[18] By making the partnership a distinct entity from its partners, RUPA avoids problems caused by mandatory dissolution.[19]
RUPA's underlying philosophy differs radically from UPA's, thus laying the foundation for many of its innovative measures. RUPA adopts the "entity" theory of partnership as opposed to the "aggregate" theory that the UPA espouses.[[20]] Under the aggregate theory, a partnership is characterized by the collection of its individual members, with the result being that if one of the partners dies or withdraws, the partnership ceases to exist.[[21]] On the other hand, RUPA's entity theory allows for the partnership to continue even with the *310 departure of a member because it views the partnership as "an entity distinct from its partners."[22]
RUPA effects this change by
giv[ing] supremacy to the partnership agreement in almost all situations. [RUPA] is, therefore, largely a series of "default rules" that govern the relations among partners in situations they have not addressed in a partnership agreement. . . .
. . . .
. . . RUPA's basic thrust is to provide stability for partnerships that have continuation agreements . . . [RUPA] provides that there are many departures or "dissociations" that do not result in a dissolution.
. . . Many dissociations result merely in a buyout of the withdrawing partner's interest rather than a winding up of the partnership's business.[23]
This means that RUPA's default rules are gap-filling rules that control only when a question is not resolved by the parties' express provisions in an agreement.[24]
Section 67-404 carries out the legislative intent to make the partnership provisions the controlling rules and the 1998 UPA provisions the default rules. Except for limited exceptions that do not apply here,
relations among the partners and between the partners and the partnership are governed by the partnership agreement. To the extent the partnership agreement does not otherwise provide, the Uniform Partnership Act of 1998 governs relations among the partners and between the partners and the partnership.[25]
Section 67-431 provides that a partner's voluntary withdrawal no longer results in mandatory dissolution; it results in a partner's "dissociation." Section 67-433(1) manifests a legislative intent to create separate pathsdissolution and winding up or mandatory buyout through which a dissociated partner can recover partnership interests: "If a partner's dissociation results in a dissolution and winding up of the partnership business, sections 67-439 to 67-445 [dealing with dissolution and winding up] apply; otherwise, sections 67-434 to 67-438 [dealing with mandatory buyout] apply."[26] The comment to § 603 of RUPA, the section upon which § 67-433 is patterned, specifically provides that it operates as a "`switching'" provision.[27]

(c) Under the 1998 UPA, Dissolution Is Only a Default Rule
Harley incorrectly argues that § 67-439(1) mandates dissolution. Apart from circumstances that are not present, § 67-439, in relevant part, provides:
A partnership is dissolved, and its business must be wound up, only upon the occurrence of any of the following events:
(1) In a partnership at will, the partnership's having notice from a partner. . . of that partner's express will to withdraw as a partner, or on a later date specified by the partner.
*311 It is true that this section does not clearly state it is a default rule that does not apply if the agreement provides otherwise. But we construe statutes relating to the same subject matter to maintain a sensible and consistent scheme and to give effect to every provision.[28] When read together with § 67-404 (partnership agreement controls except for limited exceptions) and § 67-433 (providing separate paths of dissolution or mandatory buyout), we conclude dissolution for a partner's voluntary withdrawal under § 67-439(1) is a default rule. Section 67-439(1) applies only when the partnership agreement does not provide for the partnership business to continue. Moreover, the 1998 UPA specifically requires that we apply and construe the act "to effectuate its general purpose to make uniform the law with respect to the subject of the act among states enacting it."[29] Section 67-439 is taken from § 801 of RUPA. Comment 1 to § 801 provides in part:
With only three exceptions, the provisions of Section 801 are merely default rules and may by agreement be varied or eliminated as grounds for dissolution. The first exception is dissolution under [subsection (4) resulting from carrying on an illegal business. The other two exceptions cover the power of a court to dissolve a partnership under [subsection (5)] on application of a partner and under [subsection (6) on application of a transferee.[30]
Regarding voluntary withdrawal from a partnership, comment 3 explicitly provides that RUPA's rule of mandatory dissolution upon a partner's withdrawal is a default rule. It "applies only [absent] an agreement affording the other partners a right to continue the business."[31] Comment 1 explains that a partnership agreement cannot preclude a partner from seeking a judicial dissolution under § 67-439(5), but Harley did not seek a judicial dissolution. In fact, he was actively seeking to continue the business himself by purchasing Don's interest. Harley's actions were consistent with the partnership agreement, which allows the remaining partners to continue the business despite a partner's voluntary withdrawal.

(d) Parties Intended Partnership to Continue
We reject Harley's argument that the partnership was dissolved upon his voluntary withdrawal under § 67-439(1) because we conclude that the parties' agreement gave the remaining partners a right to continue the business. Although section 11 of the partnership agreement is titled "Dissolution or Termination of the Partnership," the reference to dissolution in the title merely reflects the original UPA rules. Those rules mandated a partnership's dissolution after a voluntary withdrawal or death of a partner.[32] But what is relevant under the 1998 UPA is whether the parties agreed the business could continue. Three separate provisions of the partnership agreement show that Don and Harley intended to allow the partnership to continue.
First, section 3 provides that the partnership "shall continue until dissolved by mutual agreement or by the terms of this agreement." In section 14, the parties *312 explicitly agreed that termination of the partnership would occur only upon two events: (1) "the remaining partner(s) do not elect to purchase the interest of the retiring, deceased or legally incapacitated partner" or (2) "the partners mutually agree to dissolve the partnership." Finally, subparagraph (c) of section 11 provides: "In the event of the withdrawal . . . the remaining partner(s) shall have the right to continue the business of the partnership. . ., but they shall pay to the retiring partner . . . the value of such partner's interest in the partnership as provided in [Section 12]." We conclude that the agreement gave the remaining partners a right to continue the business despite the withdrawal of a partner. So the default rule of dissolution under § 67-439(1) did not apply.

(e) Partnership Was Not Dissolved Because of Don's Failure to Timely Pay the Buyout Price
Because dissolution is no longer mandatory, the parties' agreement that a remaining partner has the right to continue the business controls. Harley, however, contends that because Don failed to comply with the 90-day time limit for purchasing a withdrawing partner's interest under section 13, Don did not elect to purchase Harley's interest under section 14. His argument is twofold. Harley's statutory argument is that RUPA requires strict compliance with an "anti-dissolution" provision to avoid automatic dissolution and winding up. His contract interpretation argument is that the partnership agreement required dissolution when Don failed to timely pay the buyout price for his interest.

(i) RUPA Does Not Require Strict Compliance With a Buyout Provision to Avoid Dissolution
Harley's statutory argument that the partnership is dissolved is diametrically opposed to RUPA's main premisethat the partnership agreement controls in almost every circumstance. Except for an unpublished trial court judgment from Florida,[33] the cases Harley cites are not on point; they do not support a strict compliance rule that requires dissolution for breach of a buyout provision.[34]
The Florida case fails to persuade us. We acknowledge the Florida trial court stated that agreements to avoid automatic dissolution "are in derogation of the common law and the Uniform Partnership Act."[35] But New York's partnership law controlled that wrongful expulsion action, and New York, has not adopted RUPA. Further, the trial court did not cite any authority for this statement. The decision was motivated by the audacity of the partnership's argument that in expelling a partner, it had contractually insulated itself from dissolution no matter how egregious its conduct in breaching its partnership agreement.[36]
More important, concluding that RUPA requires strict compliance with a buyout provision to prevent a partnership's dissolution would be inconsistent with a main purpose of RUPA  to prevent mandatory dissolution. Further, Harley had a statutory remedy for buyout disputes. *313 Section 67-434(9) provides judicial remedies for a partnership's failure to pay a buyout price. If strict compliance with a buyout provision were required to avoid dissolution, RUPA would not provide a withdrawing partner with remedies. The result would simply be dissolution. We reject Harley's strict compliance argument. The question remains, however, whether the parties intended the business to dissolve because of a remaining partner's failure to timely pay the buyout price for the withdrawing partner's interest.

(ii) Parties Did Not Intend Partnership to Dissolve for Late Payment of Buyout Price
We reject Harley's contract interpretation argument that because Don failed to pay the buyout price within the 90-day time limit under section 13, Don did not elect to purchase Harley's interest under section 14. Before Harley's withdrawal was effective, Don informed Harley that he was electing to continue the business and asked Harley the price at which Harley would be willing to sell his interest. The agreement's provisions do not show that Don's election to continue the business was conditioned upon his timely payment of the buyout price.
As noted, section 13 provides that "[t]he value of the partner's interest as determined in [section 12] shall be paid without interest to the withdrawing or retiring partner not later than 90 days after the effective date of the dissolution or termination." So, under section 13, if the parties do not agree on the buyout price, the agreement effectively requires the appraisal process in section 12 to be completed within 180 days of a withdrawing partner's giving notice to withdraw.
Section 13, however, does not state that the partnership's failure to pay the buyout price within 90 days shall result in the dissolution of the partnership. Similarly, section 11 does not condition a remaining partner's right to continue "the partnership upon his timely payment of the buyout price. Instead, section 11 states that if a remaining partner elects to continue the business, the remaining partner shall pay the value of the withdrawing partner's interest. And section 14 does not provide that the business will terminate if a remaining partner fails to timely pay the buyout price. Thus, we do not interpret the partnership agreement as requiring dissolution because Don failed to timely purchase Harley's interest under section 13. Harley's contract interpretation argument fails.
Instead, we read the partnership agreement to mandate a buyout of a withdrawing partner's interest, but it failed to specify a remedy for the partnership's failure to pay, or to timely pay, the buyout price. Therefore, because the agreement is silent on this point, the default rules of the 1998 UPA apply.

(f) Default Remedy for Breach of a Mandatory Buyout Provision
As noted, under the switching provision in § 67-433(1), when a partner's dissociation does not result in dissolution of the partnership, the mandatory buyout provisions of "sections 67-434 to 67-438 apply." The purchase of a dissociated, partner's interest is governed by § 67-434. Harley argues that subsection (5) required Don to pay an estimated buyout price of Harley's interest when the parties could not agree on the value. Section 67-434(5) provides:
If no agreement for the purchase of a dissociated partner's interest is reached within one hundred twenty days after a written demand for payment, the partnership shall pay, or cause to be paid, in cash to the dissociated partner the amount the partnership estimates to be *314 the buyout price and accrued interest, reduced by any offsets and accrued interest under subsection (3) of this section.
Harley further argues that under § 67-434(5), his notice of his intent to withdraw constituted a written demand for payment. Thus, he argues, Don had a total of 180 days, under the partnership agreement, to pay the estimated buyout price. We disagree. Subsection (5) does not refer to any time limit within a partnership agreement. The 180 days under the partnership agreement is irrelevant under subsection (5). Instead, the event that triggers a partnership's duty to pay an estimated buyout price within 120 days is a written demand, which Harley did not make. We conclude that this provision has no application.
Further, even if subsection (5) applied, nothing in § 67-434 provides dissolution as a remedy for a partnership's failure to timely pay an estimated buyout price. Harley cannot rely on a mandatory buyout provision in § 67-434 to bolster his argument that the partnership was in dissolution. Such an argument is inconsistent with § 67-433(1), which creates separate paths through which a withdrawing partner can recover his or her interest. A withdrawing partner's rights are governed by the dissolution and winding up provisions or the mandatory buyout provisions, but not both. Section 67-434(9) provided Harley's remedy for the partnership's failure to timely pay the buyout price or its unsatisfactory offer:
A dissociated partner may maintain an action against the partnership, pursuant to subdivision (2)(b)(ii) of section 67-425, to determine the buyout price of that partner's interest, any offsets under subsection (3) of this section, or other terms of the obligation to purchase. The action must be commenced within one hundred twenty days after the partnership has tendered payment or an offer to pay or within one year after written demand for payment if no payment or offer to pay is tendered.

Harley, however, failed to use this provision. On March 28, 2002, Don offered to pay Harley $1.25 million for his interest. Harley did not seek a judicial valuation of his interest under § 67-434(9) within 120 days of March 28. So he has waived this remedy.
In sum, the district court correctly concluded that the partnership was not dissolved, but we believe its reasoning regarding Don's breach of section 13's buyout deadline was incorrect. The district court concluded that Harley had lost his right to enforce the partnership agreement. Implicit in this determination was the court's reasoning that if Harley could have enforced the agreement, the partnership would have been dissolved. This reasoning was incorrect. Under the partnership agreement, Harley did not have the right to force the partnership's dissolution when Don elected to continue the business. Although Don failed to timely pay the buyout price, absent a remedy provision in the agreement, Harley's remedy was statutory. His statutory remedy against the partnership did not include dissolution, and he waived the remedy of judicial valuation. Therefore, section 12 of the agreement provided the method for determining his interest's value.

3. HARLEY WAS NOT ENTITLED TO PROFIT DISTRIBUTIONS OR ACCRUED INTEREST
Harley alternatively argues that if the district court correctly determined the partnership was not in dissolution, then the court erred in (1) applying part of his earnings toward the buyout price of his interest and (2) determining what Don *315 owed Harley for his interest. The court determined that the value of Harley's interest was $1.175 million. It also determined that the partnership's payments to Harley and Marion through December 31, 2002, were income distributions. The parties stipulated that between the effective date of Harley's withdrawal, December 20, 2001, to December 31, 2002, the partnership paid Harley and Marion $153,513.18, which represented 50 percent of its earnings for that period. But the court determined that the partnership's payments from January 1, 2003, to December 31, 2005, totaling $431,206.98, applied toward the purchase price of Harley's interest. Finally, it determined that Harley was not entitled to accrued interest for two reasons: (1) Interest was only available if Don had refused to pay Harley, which was not the case, and (2) the agreement provided that no interest was to be paid.
Harley is not disputing the partnership's valuation at $2.35 million. But he contends that the court erred in applying the partnership earnings he received after January 1, 2003, toward the purchase price of his interest. He argues that because Don had not yet purchased his interest, the payments after January 1, 2003, should have been considered "income or interest payments to dissociated partners" under § 67-434  the mandatory buyout statute dealing with the purchase of a dissociated partner's interest.[37]

(a) Dissociated Partners Are Not Entitled to Profit Distributions Under § 67-434
The partnership agreement is silent on whether a withdrawing partner is entitled to profit distributions until the remaining partners pay for his interest. Thus, the statutory default rules for mandatory buyouts under § 67-434 control this issue. Under the original UPA, when a partnership continued after dissolution, § 67-342 allowed a withdrawing partner, in specified circumstances, to, elect to receive the value of his partnership interest plus interest. Or, instead of interest, a partner could elect to receive a share of profits until the accounts were settled.[38] Don correctly argues, however, that the, 1998 UPA did not carry over the option to elect a share of profits. Under the 1998 UPA, § 67-434(2) provides that the buyout price for a dissociated partner's interest must include the value of his interest, plus interest "paid from the date of dissociation to the date of payment." It does not authorize profit distributions. RUPA's counterpart to § 67-434 is § 701. The comments to § 701 specifically provide that "[t]he UPA . . . option of electing a share of the profits in lieu of interest has been eliminated."[39]
In his reply brief, Harley acknowledges this change in the law. We conclude that Harley was not entitled to profit distributions after the effective date of his withdrawal.

(b) The Partnership Agreement Precludes Accrued Interest
Harley next contends that he was entitled to have the court consider the distributions he received as accrued interest on the value of his partnership interest. The district court reasoned, in part, that Harley was not entitled to interest because the partnership agreement precluded the payment of interest. Section 13 provides: "The value of the partner's interest as determined in [section 12] shall be paid without interest to the withdrawing or *316 retiring partner . . . But Harley counters that "[t]he Partnership Agreement is silent as to what should happen if the buyout is not completed within ninety days."[40] He argues that § 67-434(2) therefore operates as a gap filler and requires interest to be paid from the date of his dissociation to the date the partnership pays the buyout price. Harley's argument overlooks the obvious fact that the partnership agreement is not silent on the payment of interest. Section 13 specifically precludes interest. Comment 3 of RUPA's counterpart to § 67-434 provides in part:
The Section 701 rules are merely default rules. The partners may, in the partnership agreement, fix the method or formula for determining the buyout price and all of the other terms and conditions of the buyout right. Indeed, the very right to a buyout itself may be modified, although a provision providing for a complete forfeiture would probably not be enforceable.[41]
In his reply brief, Harley argues that the purpose of requiring a partnership to pay interest is to compensate dissociated partners for the use of their capital. He claims that requiring interest eliminates the partnership's incentive to delay paying the buyout price. Comment 3 to § 701 of RUPA supports Harley's contention that "the partnership must pay interest . . . to compensate the dissociating partner for the use of his interest in the firm."[42] And we recognize that equity principles apply in partnership disputes unless displaced by the 1998 UPA.[43] Yet enforcing section 13 does not cause a forfeiture of Harley's partnership interest. Nor can we conclude that the partnership has unfairly benefited from the use of Harley's capital interest when Harley was largely responsible for delays in the appraisal process. Moreover, the court gave Harley the benefit of profit distributions through December 2002 that he was not statutorily entitled to receive. We conclude that the partnership agreement controls and that Harley was not entitled to accrued interest on the value of, his partnership interest because the partnership agreement precluded interest. Because Harley was not entitled to profit distributions or accrued interest, the district court did not err in applying the partnership's distributions after January 1, 2003, to the purchase price of Harley's interest.

VI. CONCLUSION
For reasons other than those stated by the district court, we conclude that the court did not err in determining that the partnership was not dissolved by Don's failure to timely pay the buyout price for Harley's interest after Harley withdrew from the partnership. We further conclude that the district court did not err in applying some partnership distributions to Harley toward the buyout price of his partnership interest. Harley was not entitled to profit distributions after his dissociation. The court also did not err in failing to treat the distributions as accrued interest when the partnership agreement specifically provided that the partnership was not required to pay interest on the value of a withdrawing partner's interest.
AFFIRMED.
WRIGHT, J., not participating.
NOTES
[1] See Neb.Rev.Stat. §§ 67-401 to 67-467 (Reissue 2003).
[2] Shoemaker v. Shoemaker, 13 Neb.App. lxvi (No. A-05-476, May 18, 2005).
[3] See Gast v. Peters, 267 Neb. 18, 671 N.W.2d 758 (2003).
[4] See County of Sarpy v. City of Gretna, 273 Neb. 92, 727 N.W.2d 690 (2007).
[5] See Smith v. City of Papillion, 270 Neb. 607, 705 N.W.2d 584 (2005).
[6] In re Adoption of Kailynn D., 273 Neb. 849, 733 N.W.2d 856 (2007).
[7] Dissolution of Midnight Star Enterprises, 724 N.W.2d 334 (S.D.2006); Wallerstein v. Spirt, 8 S.W.3d 774 (Tex.App.1999); Waikoloa Ltd. Partnership v. Arkwright, 268 Va. 40, 597 S.E.2d 49 (2004).
[8] See §§ 67-401 to 67-467.
[9] See Neb.Rev.Stat, §§ 67-301 to 67-346 (Reissue 2003).
[10] See, Introducer's Statement of Intent, L.B. 523, Banking, Commerce and Insurance Committee, 95th Leg., 1st Sess. (Feb. 18, 1997); Prefatory Note, Unif. Partnership Act (1997), 6 (Pt.1) U.L.A. 5 (2001).
[11] See § 67-301.
[12] See, Della Ratta v. Larkin, 382 Md. 553, 856 A.2d 643 (2004); Warnick v. Warnick, 76 P.3d 316 (Wyo.2003).
[13] Brief for appellants at 22.
[14] See § 67-331.
[15] § 67-337.
[16] See § 67-330.
[17] See § 67-337.
[18] See, 2 Alan R. Bromberg & Larry E. Ribstein, Bromberg and Ribstein on Partnership § 7.03(a) (2007); RUPA, supra note 10, § 801, comment 1 at 190.
[19] See § 67-409(1).
[20] Thomas R. Hurst, Will the Revised Uniform Partnership Act (1994) Ever Be Uniformly Adopted?, 48 Fla. L.Rev. 575 (1996).
[21] See Joan B. Branch, Note, The Revised Uniform Partnership Act Breakup Provisions: Should They Be Adopted?, 25 Creighton L.Rev. 701 (1992).
[22] Creel v. Lilly, 354 Md. 77, 89-90, 729 A.2d 385, 392 (1999).
[23] Prefatory Note, Unif. Partnership Act (1997), supra note 10 at 5-6.
[24] See Black's Law Dictionary 1357 (8th ed.2004).
[25] § 67-404.
[26] § 67-433(1).
[27] Unif. Partnership Act (1997) § 603, supra note 10, comment 1 at 172.
[28] See State v. County of Lancaster, 272 Neb, 376, 721 N.W.2d 644 (2006).
[29] § 67-463.
[30] Unif. Partnership Act (1997) § 801, supra note 10, comment 1 at 190.
[31] Id., comment 3 at 190.
[32] See §§ 67-331 and 67-342.
[33] See Beasley v. Cadwalader, Wickersham & Taft, No. CL-94-8646 "AJ," 1996 WL 449247 (Fla.Cir. Mar. 29, 1996) (unpublished opinion).
[34] See, Teeter v. De Lorenzo, 275 A.D.2d 528, 711 N.Y.S.2d 629 (2000); Clark v. Gunn, 134 N.Y.S.2d 206 (N.Y.Sup.1954); Hanes v. Giambrone, 14 Ohio App.3d 400, 471 N.E.2d 801 (1984).
[35] Beasley, supra note 33, 1996 WL 449247 at *2.
[36] Id.
[37] Brief for appellants at 33.
[38] § 67-342.
[39] Unif. Partnership Act (1997) § 701, supra note 10, comment 3 at 177.
[40] Brief for appellants at 34.
[41] Unit Partnership Act (1997), supra note 10, comment 3 at 177.
[42] Id.
[43] See § 67-405.