# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## September 2014 Term

_____

No. 14-0246

_____

**FILED**

**November 14, 2014**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**CLIFTON G. VALENTINE,**
Plaintiff Below, Petitioner

v.

**SUGAR ROCK, INC.,**
**GERALD D. HALL, and TERESA D. HALL,**
Defendants Below, Respondents

_____

Certified Question from the
United States Court of Appeals for the Fourth Circuit
The Honorable Robert B. King, Judge

Civil Action No. 12-2273

**CERTIFIED QUESTION ANSWERED**

_____

Submitted: September 3, 2014
Filed: November 14, 2014

James S. Huggins, Esq.
Daniel P. Corcoran, Esq.
Theisen Brock LPA
Marietta, Ohio
Counsel for the Petitioner

W. Henry Lawrence, Esq.
William J. O'Brien, Esq.
Amy Marie Smith, Esq.
Steptoe & Johnson, PLLC
Bridgeport, West Virginia
Counsel for the Respondents

JUSTICE KETCHUM delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1. "A de novo standard is applied by this Court in addressing the legal issues presented by a certified question from a federal district or appellate court." Syllabus Point 1, *Light v. Allstate Ins. Co.*, 203 W.Va. 27, 506 S.E.2d 64 (1998).

2. When reviewing a question certified from a federal district or appellate court, this Court will give the question plenary review, and may consider any portions of the federal court's record that are relevant to the question of law to be answered.

3. "While co-owners or joint owners of a mining lease, before they operate for oil or gas, are tenants in common or joint tenants, when they unite and co-operate in working the lease, they constitute a mining partnership." Syllabus Point 1, *Manufacturers Light & Heat Co. v. Tenant*, 104 W.Va. 221, 139 S.E. 706 (1927).

4. A common law mining partnership cannot exist without there being two or more people sharing ownership of a mineral interest. Some form of concurrent ownership is an indispensable requisite.

5. For a person to establish an ownership interest in a mining partnership, the Statute of Frauds requires that the person show their interest was created or conveyed by a deed, will, or similar written conveyance.

6. Under the Revised Uniform Partnership Act, a partnership is an association of two or more persons to carry on as co-owners a business for profit, whether

or not the persons intend to form a partnership. *W.Va. Code* §§ 47B-1-1(7) [2003] & 47B-2-2(a) [1995].

7.    The Revised Uniform Partnership Act is a "gap filler" in that it only governs partnership affairs when there is no partnership agreement, or to the extent a partnership agreement does not otherwise provide. *W.Va. Code* § 47B-1-3(a) [1995].

8.    Under the Revised Uniform Partnership Act, property acquired by a partnership is property of the partnership and not of the partners individually. *W.Va. Code* § 47B-2-3 [1995].

9.    Under the Revised Uniform Partnership Act, a partnership interest – regardless of the nature of the partnership's assets – is personal property, not real property. The Statute of Frauds is therefore inapplicable to the relationship between partners, and does not require that a partnership interest in the partnership be proven by a written instrument. *W.Va. Code* §§ 36-1-1 [1923] and 47B-2-3 [1995].

Justice Ketchum:

The United States Court of Appeals for the Fourth Circuit has certified a complex question which intertwines issues about partnership interests in oil and gas wells, the Statute of Frauds, the common law "mining partnership," and the *West Virginia Revised Uniform Partnership Act* (*W.Va. Code* § 47B-1-1, *et seq*.). At its heart, the question asks us to differentiate between a partner in an ordinary, general partnership that has as its principal business mining or operating oil and gas wells, and a partner in a common law "mining partnership." While the two phrases sound the same, they are radically different forms of partnerships.

The case below involves oil and gas wells owned and operated by four partnerships. The partnerships also own real property: mineral interests in the form of leases to extract oil and gas from real estate. The plaintiff contends that he is a partner of each of these partnerships. The partners themselves do not own any part of the mineral interests. Nevertheless, another partner contends that the plaintiff should be excluded from the partnerships because he cannot produce a written instrument that meets with the Statute of Frauds showing he is a partner in the real-estate-owning partnerships.

The certified question from the federal court essentially has two parts. First, if a person contends he/she owns an interest in a common-law "mining partnership," then does the Statute of Frauds require the person to prove he/she is a partner of the mining partnership through a deed, will, or other written conveyance? We answer this part of the question "yes." A person can only be a partner in a mining

1

partnership if he/she is a co-owner of the mineral interest with the other partners. Hence, proving a partnership interest in the mining partnership requires first proving the person has a deed, will, or other written instrument showing partial ownership of the mineral interest in the land.

The second part of the question is this: if a partnership is a general partnership (as defined in and governed by the *West Virginia Revised Uniform Partnership Act*), and the partnership owns leases to extract oil and gas from real property, then does the Statute of Frauds require a person to produce a written instrument to prove he/she is a partner in the general partnership? We answer this part of the question "no." Under the *Revised Uniform Partnership Act*, *W.Va. Code* § 47B-2-3 [1995], general partnership property belongs solely to the partnership and not to the partners. A person does not need a deed, will or other written instrument to establish a partnership stake in the general partnership, even if the general partnership owns an interest in real property.

**I.**
**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff-below Clifton G. Valentine alleges that, since the 1950s, he has owned a partnership interest in partnerships that operate six oil and gas wells in Ritchie County, West Virginia. The wells are on four separate tracts of land, and are owned and

operated by four separate partnerships: Cutright Oil & Gas Co.;[1] Iams Gas Co.; Iams Oil Co.; and Keith Gas Co.[2] Each of the four partnerships operates under a written lease with the landowner that allows for the extraction of oil and gas from each tract of land. Valentine maintains he became a partner in each partnership when he bought interests in the partnerships from Frank "F.A." Deem, who created the four partnership entities in the late 1950s. Since that time, the partnerships continued to operate the oil and gas wells.

For about forty years, Valentine received payments from the four partnerships reflecting his share of the net profits generated by the well operations. Those payments stopped in 1999, however, when Frank Deem's son and successor in interest, William "W.A." Deem, sold the majority interest in the partnerships to the defendant below, Sugar Rock, Inc.

After Sugar Rock became managing partner of the four partnerships and simultaneously became the operator of the six wells, the wells allegedly began to operate at a net annual loss. Sugar Rock annually delivered partnership tax documents[3] to Valentine reflecting these losses. Further, Sugar Rock billed Valentine for his share of

---

[1] Both the certification order from the Court of Appeals and the brief of Sugar Rock erroneously refer to this partnership as "Cuthright Oil & Gas."

[2] Mr. Valentine asserts he has a 3/32 interest in Cutright Oil & Gas; a 2/32 interest in Iams Gas; a 5/32 interest in Iams Oil; and a 1/32 interest in Keith Gas. Three wells produce oil and gas on Cutright's tract, with single wells producing on the tracts leased by the other three partnerships.

[3] Specifically, each year Valentine received an IRS Schedule K-1, Form 1065, titled "Partner's Share of Income, Deductions, Credits, etc." from each of the four partnerships.

the deficiencies, but he refused to remit payment. In 2001, Sugar Rock filed suit in state court against Valentine to recover the alleged deficiencies; the suit was dismissed in 2004 for failure to prosecute.

## A. Proceedings before the U.S. District Court

On November 8, 2010, Valentine filed a diversity action against Sugar Rock[4] in the United States District Court for the Northern District of West Virginia. Valentine asserted that Sugar Rock had not properly accounted for the proceeds and expenses of production for the six wells, and had breached its duty of good faith and fair dealing toward other partners in the four partnerships. Valentine claims Sugar Rock is "scheming to usurp partnership property" by depositing all the partnership income in Sugar Rock's account, and then invoicing the partnerships for unauthorized, unnecessary, and unreasonable expenses. Valentine demanded an accounting of the four partnerships, and sought compensatory and punitive damages together with reimbursement of his attorney fees and litigation costs. Sugar Rock answered the complaint and filed a counterclaim against Valentine seeking Valentine's share of the operating expenses attributable to his ownership interests in the four partnerships.

---

[4] In addition to naming Sugar Rock, Inc. (the owner of the majority interest in the partnerships), Valentine named two of Sugar Rock's officers, Gerald D. Hall and Teresa D. Hall, as defendants. We collectively refer to all three defendants as "Sugar Rock."

The parties engaged in discovery in the district court after which Sugar Rock moved for summary judgment. In its motion, Sugar Rock characterized the four partnerships as "mining partnerships," which arise when the co-owners or co-lessees of an interest in land cooperate in extracting oil, gas, or other minerals from the land. *See, e.g.*, Syllabus Point 1, *Childers v. Neely*, 47 W.Va. 70, 34 S.E. 828 (1899) ("Where tenants in common or joint tenants of an oil lease or mine unite and co-operate in working it, they constitute a mining partnership."). Sugar Rock asserted it was entitled to summary judgment because Valentine could produce no written instrument creating his partnership interest in the four "mining partnerships" that own and operate the oil and gas wells.

In support of its motion for summary judgment, Sugar Rock argued that the creation of the four leaseholds conveyed interests in real property. *See* Syllabus Point 1, in part, *McCullough Oil, Inc. v. Rezek*, 176 W.Va. 638, 346 S.E.2d 788 (1986) ("An oil and gas lease (or other mineral lease) is both a conveyance and a contract."). Further, Sugar Rock argued that any subsequent assignment of a partnership interest in the oil and gas leases similarly conveyed interests in real property. Working from the premise that the partnership interests in the four leases claimed by Valentine are interests in real property, Sugar Rock maintained that their purported transfer could only be effected by a writing contemplated by the West Virginia Statute of Frauds, *W.Va. Code* § 36-1-1 [1923]. Thus, Sugar Rock reasoned, Valentine's lack of a written deed or will evidencing his ownership of the partnership interests in question doomed his claim.

5

In response, Valentine asserted to the district court that Sugar Rock's arguments failed to distinguish between "a direct ownership interest in real estate and an ownership interest in a partnership." West Virginia's common law and statutes permit a partnership agreement to be written, oral, or implied from the conduct and dealings of the partnership's members. *See* Syllabus Point 2, *Duffield v. Reed*, 84 W.Va. 284, 99 S.E. 481 (1919) ("A partnership, as to the parties thereto, springs from their intention, which need not be expressed in writing, but may be by oral agreement, or may be implied from their conduct and dealings with one another."); *W.Va. Code* § 47B-1-1(8) [2003] ("'Partnership agreement' means the agreement, whether written, oral or implied, among the partners concerning the partnership, including amendments to the partnership agreement."). Valentine contended that he did not purchase a direct ownership interest in real estate, but rather that he purchased an ownership interest in four partnerships, and it was the partnerships that owned the real estate interests. Valentine asserted there was substantial evidence to support a finding he was a partner in each of the four partnerships, and was therefore entitled to share in the profits generated by the leases owned by the partnerships.

In an order dated September 18, 2012, the district court granted summary judgment to Sugar Rock and dismissed Valentine's claims with prejudice.[5] The district court discerned that, under West Virginia law, a "mining partnership" requires a member

---

[5] *See Valentine v. Sugar Rock, Inc.*, 2012 WL 4320850 (N.D.W.Va. Sept. 18, 2012).

6

of the partnership to establish "co-ownership of lands or leases constituting a property interest." The district court determined that Valentine's assertion of an interest in the four "mining partnerships" failed because he could not produce a deed or will in conformance with the Statute of Frauds showing his ownership interest in the partnerships or in the subject leases.

Valentine timely appealed the district court's order to the United States Court of Appeals for the Fourth Circuit.

## B. *Washburn v. Sugar Rock*

During the pendency of his appeal, Valentine notified the Court of Appeals of the existence of a similar lawsuit in the Circuit Court of Ritchie County styled *Washburn v. Sugar Rock*.[6] Nine other people, who purported to be owners of partnership interests in the same four partnerships operating the same six wells, filed a class action in state court against Sugar Rock. On July 19, 2013, the circuit court granted the *Washburn* plaintiffs' motion for partial summary judgment against Sugar Rock and declared that the plaintiffs are partners in the four partnerships. Further, the circuit court determined that the plaintiffs own the claimed partnership interests despite being unable to corroborate the claim with a deed, will, or other written instrument. The plaintiffs' stake in the mineral interest derives indirectly from their proportional participation in the four partnerships, which own the mineral leases and operate the oil and gas wells.

---

[6] *Washburn v. Sugar Rock, Inc.*, No. 11-C-61 (Cir. Ct. Ritchie County).

7

The state circuit court in *Washburn* relied on evidence and legal arguments comparable to those presented to the federal district court by Valentine.[7]

### C.  Proceedings before the U.S. Court of Appeals

Writing for the U.S. Court of Appeals, Judge King perceived the conflict between the decisions of the federal district court and the state circuit court as a "chicken-or-the-egg conundrum." *Valentine v. Sugar Rock, Inc.*, 745 F.3d 729, 734 (4th Cir. 2014). The federal district court had ruled that "the absence of a preexisting property interest documented by deed or will forecloses, *ab initio*, the creation of a 'mining partnership[.]'" *Id.*  Judge King wisely observed, however, that the federal district court had failed to consider whether West Virginia law recognized "a 'partnership in mining,' that is, the formation of an ordinary partnership that happens to have as its primary purpose the exploitation of minerals." *Id.*

---

[7] As the Court of Appeals summarized the evidence in *Washburn*:

> [A]ccording to the [state circuit] court, the plaintiffs were entitled to partial summary judgment regarding their claims to the . . . [partnership] interests in dispute.  The court ruled that – in the absence of any evidence to the contrary – ownership had been sufficiently demonstrated by the plaintiffs' affidavits, appended with documents of record establishing each partnership, detailing the various interests therein, and subsequently assigning those interests. . . . The affidavits additionally incorporated the Schedule K-1s that Sugar Rock had, from 1999 through 2011, delivered each year to the plaintiffs.

*Valentine v. Sugar Rock, Inc.*, 745 F.3d 729, 734 (4th Cir. 2014).

Judge King was rightly troubled that the federal district court and the state circuit court had applied similar precepts of West Virginia law to the identical Ritchie County properties, and yet had reached manifestly irreconcilable outcomes. 745 F.3d at 735 n.3. Further, he could not discern a clear, concise, or cogent controlling precedent in the decisions of this Court that would be dispositive of the question of which court's interpretation of the law was correct.

Because of the vagaries of West Virginia law on this issue, on March 12, 2014, the U.S. Court of Appeals decided to certify the following question to this Court:

> Whether the proponent of his own working interest in a mineral lease may prove his entitlement thereto and enforce his rights thereunder by demonstrating his inclusion within a mining partnership or partnership in mining, without resort to proof that the lease interest has been conveyed to him by deed or will or otherwise in strict conformance with the Statute of Frauds.

745 F.3d at 735. We agreed to review the question.

## II.
## STANDARD OF REVIEW

When considering an order certifying a question from a federal court, we give the court's assessment of the question a plenary review. "A de novo standard is applied by this Court in addressing the legal issues presented by a certified question from a federal district or appellate court." Syllabus Point 1, *Light v. Allstate Ins. Co.*, 203 W.Va. 27, 506 S.E.2d 64 (1998). *Accord* Syllabus Point 1, *Bower v. Westinghouse Elec. Corp.*, 206 W.Va. 133, 522 S.E.2d 424 (1999) ("This Court undertakes plenary review of legal issues presented by certified question from a federal district or appellate court.").

9

In its brief to this Court, Sugar Rock argues that this Court is constrained to consider only those facts contained in the certification order from the Court of Appeals. Sugar Rock contends that this Court cannot consider any other facts of record. As its only authority, Sugar Rock cites to a footnote which states, "This Court is bound by the facts contained in the district court's certification order." *L.H. Jones Equipment Co. v. Swenson Spreader LLC*, 224 W.Va. 570, 573 n.3, 687 S.E.2d 353, 356 n.3 (2009). This Court has consistently held, however, that "language in a footnote generally should be considered obiter dicta" and that if this Court is to create a new point of law, it will do "so in a syllabus point and not in a footnote." *State ex rel. Med. Assurance of West Virginia, Inc. v. Recht*, 213 W.Va. 457, 471, 583 S.E.2d 80, 94 (2003).[8]

Still, Sugar Rock repeatedly cites the lone footnote in *L.H. Jones Equipment*. Sugar Rock insists that Valentine's brief "should be stricken by this Court" because it does not parrot the federal court's recitation of facts, but rather asserts facts taken from the record presented to the federal court. However, the language of the *Uniform Certification of Questions of Law Act* compels us to reject Sugar Rock's interpretation of our authority to review certified questions and to disavow and renounce our footnoted statement in *L.H. Jones Equipment*.

---

[8] *See also*, Syllabus Point 1, *State v. McKinley*, ___ W.Va. ___, ___ S.E.2d ___, 2014 WL 5032604 (No. 13-0745, Sept. 29, 2014) ("Signed opinions containing original syllabus points have the highest precedential value because the Court uses original syllabus points to announce new points of law or to change established patterns of practice by the Court.").

10

The *Uniform Certification of Questions of Law Act*, W.Va. Code § 51-1A-6(a)(2) [1996] requires a certification order from a federal court or other state appellate court to contain "[t]he facts relevant to the question [of law to be answered], showing fully the nature of the controversy out of which the question arose." The purpose of this requirement is that the certifying court sends only one document to this Court for review: the certification order. No briefs of the parties, no appendix, and no matters of record accompany the certification order. This Court must, therefore, "assume that the findings of fact by the certifying court are correct." *Barefield v. DPIC Companies, Inc.*, 215 W.Va. 544, 550, 600 S.E.2d 256, 262 (2004). The only way this Court can fairly assess whether to accept the question for our discretionary review, or to reject it, is to weigh the question in light of the facts presented in the certification order. That is why the certification order must contain a statement of relevant facts.

Nevertheless, once this Court accepts the certified question for review, we may consider any papers or exhibits filed in the certifying tribunal. This is because the *Uniform Certification of Questions of Law Act* allows this Court to "require the certifying court to deliver its record, or any portion of the record" to this Court. *W.Va. Code § 51-1A-5* [1996]. Further, the Act provides that proceedings for review of a certified question are controlled "by the rules and statutes of this State governing briefs, arguments and other appellate procedures." *W.Va. Code § 51-1A-8* [1996]. Our *Rules of Appellate Procedure* [2010], specifically Rule 17(a)(4), says that "parties to a certified question case must file . . . a joint appendix" containing relevant parts of the record that will assist this Court with a full understanding of the issues. And as a final stopgap measure, Rule

11

6(a) of the *Rules of Appellate Procedure* permits this Court to obtain and consider "portions of the record other than those provided by the parties."

Reading the *Uniform Certification of Questions of Law Act* and our *Rules of Appellate Procedure* together, it is plain that this Court is not constrained to consider only those facts contained in the certification order from the federal court. We therefore hold that, when reviewing a question certified from a federal district or appellate court, this Court will give the question plenary review, and may consider any portions of the federal court's record that are relevant to the question of law to be answered. *See*, *W.Va. Code* § 51-1A-5. To the extent footnote 3 of *L.H. Jones Equipment Co.* conflicts with this holding it is disavowed.

### III.
### ANALYSIS

The question certified by the federal court implicates one of West Virginia's statutes of frauds, *W.Va. Code* § 36-1-1 [1923], which "requires the creation and the conveyance of specified estates and interests in land to be by deed or will." *Cottrell v. Nurnberger*, 131 W.Va. 391, 411, 47 S.E.2d 454, 464 (1948). *W.Va. Code* § 36-1-1 states:

> No estate of inheritance or freehold, or for a term of more than five years, in lands, or any other interest or term therein of any duration under which the whole or any part of the corpus of the estate may be taken, destroyed, or

consumed, except for domestic use, shall be created or conveyed unless by deed or will. [9]

We have interpreted the "deed or will" language in *W.Va. Code* § 36-1-1 to require a writing with "words of transfer or conveyance" of an interest in an estate. *Arbaugh v. Raines*, 155 W.Va. 409, 413, 184 S.E.2d 620, 623 (1971). *See also*, *Uhl v. Ohio River R. Co.*, 51 W.Va. 106, 114-15, 41 S.E. 340, 344 (1902) ("[D]eeds generally require the word 'grant,' or the words 'bargain and sell,' or some technical word suitable to the character of the conveyance; such is formal conveyancing; but the word 'convey' is now held to be equivalent to the word 'grant,' even at common law . . . [A]ny word to show intention will do."); *Lockhart v. United Fuel Gas Co.*, 105 W.Va. 69, 72, 141 S.E. 521, 522 (1928) ("[D]eeds generally require the word 'grant' or some technical words suitable to the character of the conveyance.").

In this case, there are four tracts of land. The parties agree that at some point, the owners of those four tracts signed writings granting the four partnerships a right to drill for, take, and sell for commercial use oil and gas.[10] In other words, there

---

[9] The Statute of Frauds covers an interest in land, of any duration, when any part of the corpus of the land may be taken or consumed. In other words, a mineral lease to extract oil and gas for commercial sale is covered by the Statute of Frauds.

[10] These writings are not in the record presented to this Court. At some points, the record suggests that Frank "F.A." Deem owned the lease interests; at others, the record indicates that it is the partnerships that own the lease interests. Regardless, the record contains several written assignments of partnership interests in the same wells which all contain language to the effect that Mr. Deem and the person who received the assignment would work the lease together, and "the name of this group or mining partnership be known as the Cutright Gas Co.," or one of the other three partnerships. None of the assignments in the record document an assignment to plaintiff Valentine.

exists a writing that comports with the Statute of Frauds creating the leased interest in the oil and gas underlying each tract. This fact is not disputed by the parties.

The dispute in this case is over the ownership rights of one of the people who purchased and held a stake in the partnerships that own the leases and operate the wells. The documents and testimony of record suggest that Valentine was, in some manner, a partner in the four partnerships. The question certified by the federal Court of Appeals essentially asks this: is Valentine required to produce a deed, will, or other granting document conforming to the Statute of Frauds to establish that he is a partner in each partnership? The answer is two-fold, and lies in determining whether he is a partner in a common-law mining partnership, or a partner in an ordinary, general partnership that engaged in mining.

As we discuss below, the real property of a mining partnership belongs to the individual members of the mining partnership. Hence, each member of a mining partnership must prove their inclusion in the partnership by establishing ownership of an interest in the mineral estate that is being extracted. In other words, each partner of a mining partnership must have some writing conforming with the Statute of Frauds conveying to the partner the interest in the mineral estate.

Conversely, under the *West Virginia Revised Uniform Partnership Act*, the real property owned by a general partnership that is engaged in extracting minerals belongs to the partnership and not its partners. Any property given to or acquired by a partnership belongs to the partnership and not to the partners individually. Hence, the partners of a general partnership may prove their inclusion in the partnership, and thereby

14

prove their interest in the partnership's property, by relying on any evidence that tends to show the partners intended to associate and carry on as co-owners some trade, occupation, or profession. The Statute of Frauds simply does not apply between partners of a general partnership. The members of a general partnership are not required to have a writing conforming with the Statute of Frauds conveying to the partners a stake in the partnership, even if the partnership itself owns an interest in real property.

## A. Mining Partnerships

Mining partnerships are creatures of the common law. To understand how mining partnerships operate requires an understanding of why they were created. To understand why they were created requires a basic understanding of the ancient, common law rules surrounding the creation of ordinary, general partnerships.

For the sake of clarity, we will hereafter refer to the ordinary, general partnership as a "general partnership." This will distinguish the rules for common-law, ordinary, general partnerships from the legal precepts of mining partnerships.

Further, this opinion will not attempt to comprehensively discuss the common law rules of general partnerships, for a simple reason: most of those common law rules have been augmented or supplanted by statute. As we discuss in the next section, partnership law in West Virginia is now guided by the *Revised Uniform Partnership Act*. Hence, much of the following discussion on the common law of general

15

partnerships is purely historical and academic.[11]  But understanding the primordial rules

of general partnership law leads to an understanding of how mining partnerships came to

exist, and why real property ownership by the partners is critical to the formation of a

mining partnership.

A general partnership is an association of two or more persons who agree to

carry on as co-owners a trade, occupation, or profession for profit.  At common law, we

defined a general partnership as:

> a contract relation between two or more competent persons
> who have combined their money, effects, labor and skill, or
> some or all of them, in a lawful joint enterprise, or business,
> for the purpose of joint profit.

Syllabus Point 4, *Hi Williamson & Co. v. Nigh*, 58 W.Va. 629, 53 S.E. 124 (1906).[12]

---

[11] Marcus Aurelius advised that we should "look narrowly into things," to always ask, "This thing, what is it in itself, in its own constitution?"  By carefully analyzing "everything that presents itself unto thee, to consider what the true nature of it is, and to unfold it, as it were, by dividing it," we may ultimately ascertain "the true use or end of it."  Marcus Aurelius, *Meditations*, Book VI, paragraph 3; Book VIII, paragraph 11; Book XII, paragraph 14 (Arc Manor, 2008).

[12] *See also*, Syllabus Point 1, *Setzer v. Beale*, 19 W.Va. 274 (1882) ("A partnership as between the parties themselves is a voluntary contract between two or more persons for joining together their money, goods, labor or any or all of them under an understanding, that there shall be a communion of profits between them and for carrying on a legal business."); Syllabus Point 7, *Murphy v. Fairweather*, 72 W.Va. 14, 77 S.E. 321 (1913) ("A contract between the owner of timber and another person, under which the former is to furnish the timber for manufacture and sell the product and collect the proceeds, and the latter is to cut, log, and manufacture the timber and receive two-thirds of the proceeds of the lumber, creates a co-partnership between them."); *Tyler v. Teter*, 75 W.Va. 217, 219, 83 S.E. 906, 906 (1914) (the "ordinary tests for the existence of a partnership relation between two or more persons" include "a community of interest; a sharing of the profits and losses; mutuality in the management and control of the social assets; a uniting in the prosecution of a common enterprise for their joint benefit. . . . Or, .

(continued . . .)

16

A mining partnership is not a general partnership. However, there are three basic tenets of general partnerships necessary to understanding mining partnerships. First is the rule that general partnerships are personal; they are created by voluntary agreements between two or more people, each agreeing to become a partner with the others. At common law, the rule was known as *delectus personae* or "choice of the person."[13] It is the "rule that when personal relations are important, a person cannot be compelled to associate with another person," specifically "that one has the right to select the person or persons with whom one might form a partnership." *Black's Law Dictionary* 518 (10th Ed. 2014). "Those forming an ordinary partnership select the persons to form it, always from fitness, [and] worthiness of personal confidence[.]" *Childers v. Neely*, 47 W.Va. 70, 73, 34 S.E. 828, 829 (1899). Because of *delectus personae*, the law gives "wide authority of one member [of a general partnership] to bind another by contracts, by notes, and otherwise. One is the chosen agent of the other." *Id*.

Hence, under the common law, when a person left a general partnership association the partnership was instantly dissolved and ceased conducting its ordinary

. . to constitute such relation there must be a contract, express or implied, to place money, effects, labor and skill, or some of them, in lawful commerce or business, and to divide the profits and bear the loss in certain proportions."); Syllabus Point 1, *Duffield v. Reed*, 84 W.Va. at 284, 99 S.E. at 481 ("The voluntary association of two or more persons for the purpose of uniting their means, skill and labor to carry on a legal business, or perform a legitimate work, constitutes them a partnership.").

[13] It is sometimes also called *delectus personarum*, Latin for "choice of persons."

17

business.[14] The reason the person left was irrelevant. It might have been by personal choice to leave, or the choice to sell the person's interest in the partnership to a stranger; by the person's expulsion by other partners; or by the person's death or bankruptcy. Whatever the reason, dissolution of the partnership was required at common law.[15]

By the same token, at common law a stranger to the general partnership (like a bankruptcy trustee) could not join the enterprise without the unanimous assent of all of the partners.[16] "It is only by the unanimous consent of all the persons concerned that they become partners." *Blackmarr v. Williamson*, 57 W.Va. 249, 253, 50 S.E. 254, 255 (1905). "[W]hen one member dies or is bankrupt, or sells his interest to a stranger, even to an associate, the partnership is closed, one chosen member is gone, the union

---

[14] The partnership continued to exist, however, until its assets were distributed and debts were settled, a process called "winding up." *See* Syllabus Point 4, *Smith v. Zumbro*, 41 W.Va. 623, 24 S.E. 653 (1896) ("Until the affairs of the partnership are settled, and outstanding engagements made good, the partnership must, in contemplation of law, have a continuance, so far as respects the winding up of its affairs.").

[15] *See*, *e.g.*, Syllabus Point 3, *McMahon v. McClernan*, 10 W.Va. 419 (1877) (any partner may withdraw from a general partnership "at a moment's notice, when he pleases and dissolve the partnership."); Syllabus Point 3, *Conrad v. Buck*, 21 W.Va. 396 (1883) ("The assignment by one partner of all his interest in the partnership and its property to trustees for the payment of debts operates, *ipso facto*, as a dissolution of partnership."); *Hooper v. Hooper*, 32 W.Va. 526, 9 S.E. 937 (1889) (death of a partner dissolves a general partnership); *Flynn v. State Comp. Com'r*, 141 W. Va. 445, 450, 91 S.E.2d 156, 159 (1956) ("A general partnership at will is dissolved by the withdrawal in good faith by any partner whenever he desires to withdraw from the partnership.").

[16] *Setzer v. Beale*, 19 W.Va. at 288 ("It is well settled, that no stranger can be introduced into a firm as a partner without the concurrence of every member of the firm.")

18

broken, because he may have been the chief dependence for success, and the newcomer may be an unacceptable person, who would entail failure upon the firm." *Childers v. Neely*, 47 W.Va. at 73-74, 34 S.E. at 829.

The second rule of general partnerships we should remember is this: at common law, a partnership required some form of contractual agreement between the partners. No formal writing or act was required to create a general partnership, but nonetheless, there must have been some explicit or implicit evidence of a contractual relationship. As we said in Syllabus Point 1 of *William Deering & Co. v. Coberly*, 44 W.Va. 606, 29 S.E. 512 (1898):

> No particular form or solemnities are required to constitute a partnership between parties. It is sufficient that it is formed by the voluntary consent of the parties, whether that be expressed or implied; whether it be by written articles or unsolemn writings; or whether it be by tacit approbation, or by parol contracts, or even by mere acts.[17]

Third and finally, at common law, the mere shared ownership and use of property by two or more individuals (including a joint tenancy, tenancy in common, tenancy by the entireties, *etc.*) was not enough to create a partnership. One example given by this Court involves personal property: "Where two partners own a chattel, and

---

[17] *See also*, Syllabus Point 2, *Setzer v. Beale*, 19 W.Va. at 274 ("A partnership among the parties themselves results from the intention of the parties, to be gathered from the contract or from their relations to and dealings with the property of each other."); Syllabus Point 2, *Duffield v. Reed*, 84 W.Va. at 284, 99 S.E. at 481 ("A partnership, as to the parties thereto, springs from their intention, which need not be expressed in writing, but may be by oral agreement, or may be implied from their conduct and dealings with one another.").

make a profit by the use of it, they are not partners without some special agreement which makes them so." *Childers v. Neely*, 47 W.Va. at 72, 34 S.E. at 828 (citation omitted). Another example involves real property: "Two heirs or other co-owners of a farm, jointly farming it for profit, are not partners." *Id.* Even if the property owners shared the profits from the use of the property, that alone was insufficient to form a partnership.[18]

With these three common law rules for general partnerships in mind, we now consider the common law rules for mining partnerships.

In the mid- to late-1800s, largely in the American West, mining enterprises "were organized and operated before the establishment of any firm governmental authority and long before the widespread application of any body of commercial law." David Sive, 2 *Rowley on Partnership* 688 (2nd Ed. 1960). There is great expense, and great uncertainty, in mining operations, and few individuals "are willing to risk all their means in such undertakings[.]" *Skillman v. Lachman*, 23 Cal. 198, 206 (1863). Further, much of the expense occurs at the beginning of the enterprise, opening the mine or drilling the well, when the enterprise does not (and may never) produce any income. So, as a general rule, individuals are impelled to associate with others and pool their

---

[18] *See, e.g., Mankin v. Jones*, 68 W.Va. 422, 69 S.E.2d 981 (1910) (buying land for purpose of speculation does not create a partnership); Syllabus Point 1, *Tyler v. Teter*, 75 W.Va. 217, 83 S.E. 906 (1914) ("Mere sharing of profits is not a decisive test of the existence of a partnership. To constitute the relation, so far as this element is essential, it must appear the parties were to share and control the profits as common and joint owners thereof, and not merely as a measure of compensation to one of them for agreed services.").

resources, time and skills to work the mine. Many times, in the 1800s, these individuals tried to work together under the legal framework of a general partnership.

The problem came when one individual died, went bankrupt, or just wanted to sell or convey his interest in the mining operation. "[I]n ordinary partnerships, such sale would dissolve the partnership, and compel a winding up and settlement of the business, which would be most disastrous to a mining enterprise." *Id.* "Unlike a factory, service profession, or grocery store, an oil well or a coal mine cannot sensibly be shut down and closed each time a joint owner wants to withdraw from the venture. . . . The capital outlay necessary for most mining ventures is so heavily front-loaded that it is inherently unfair to allow or force the venture's termination before affording [all of the partners] a legitimate opportunity to recoup the investment." Harry L. Mathison, Jr., "Mining Partnerships, a New Perspective on an Old Theory," 2 Journal of Min. Law & Pol. 319, 321 (1987).

Additionally, a creditor or supplier who had "provided materials or services to the mining venture could easily have his legitimate claim defeated if one of the partners withdrew and the mineral property was not liquidated at a price sufficient to satisfy his claim. This scenario would obviously work an injustice on the supplier, but it would also deter creditors from extending credit to mining ventures[.]" *Id.* at 322.

To avoid the conundrum caused by the common law rules of general partnerships, various customs developed "because of the need of the mining community for a type of association not subject to the same rules that applied to the ordinary partnership." *Meister v. Farrow*, 92 P.2d 753, 757 (Mont. 1939). In this chaotic legal

21

environment, the mining partnership was adopted as a legal device used "by the courts when all other theories have failed to fit the pattern that justice requires." Clarence A. Brimmer, "Mining Partnerships," 15 Rocky Mtn. Min. L. Inst. 4 (1969).[19] The mining partnership theory is a "legal fiction" that "affords a solid foundation for resolving some of the thorniest issues which arise among joint owners of mineral properties and third parties directly affected by the activities of those joint owners." Mathison, 2 Journal of Min. Law & Pol. at 319-20.

Generally speaking, a "mining partnership is governed by all the rules applicable to ordinary partnerships, except such as flow from [the] fundamental difference[s] in the two associations." *Manufacturers Light & Heat Co. v. Tenant*, 104 W.Va. 221, 225, 139 S.E. 706, 707 (1927) (citation omitted). The common law rules of mining partnerships evolved out of necessity, "differing from those [rules] regulating ordinary partnerships," to protect individual members of a mining enterprise "and at the same time properly secure the claims of creditors and insure the successful working of the mine." *Skillman*, 23 Cal. at 206-207.[20] "A mining partnership is a hybrid concept

---

[19] To be clear, mining partnerships were not entirely creatures of the American common law. Courts in England first tinkered with the concept of a common law of mining partners. *See*, *e.g.*, *Crawshay v. Maule*, 36 Eng.Rep. 479 (Ch. 1818); *Fereday v. Wightwick*, 39 Eng.Rep. 18 (Ch. 1829).

[20] Most states, except Pennsylvania (*see Bell v. Johnston*, 281 Pa. 57, 126 A. 187 (1924)), now recognize common law mining partnerships. California, Idaho, Montana, and Nevada later incorporated the common law of mining partnerships into statute. Brimmer, 15 Rocky Mtn. Min. L. Inst. at 4; Nancy Saint-Paul, 4 *Summers Oil & Gas* § 48:5 (3rd Ed. 2004).

designed to facilitate the development of mineral properties in a commercially reasonable manner."  Mathison, 2 Journal of Min. Law & Pol. at 320.

This Court has defined a mining partnership in this way:  "Where tenants in common or joint tenants of an oil lease or mine unite and co-operate in working it, they constitute a mining partnership."  Syllabus Point 1, *Childers v. Neely*, 47 W.Va. at 70, 34 S.E. at 828.  A similar definition is found in Syllabus Point 1 of *Manufacturers Light & Heat Co. v. Tenant*, 104 W.Va. at 221, 139 S.E. at 706:  "While co-owners or joint owners of a mining lease, before they operate for oil or gas, are tenants in common or joint tenants, when they unite and co-operate in working the lease, they constitute a mining partnership."

Encompassed under this definition are three characteristics of mining partnerships which differentiate them from general partnerships.  The first, and most obvious, difference is the absence of *delectus personae*.  The members of a mining partnership lack any control over the individuals who are associated with the enterprise; "any person may become a member by virtue of an inter vivos conveyance or even inheritance, against the other members' consent."  Bob Kiesling, "Mining Partnerships," 12 Baylor L. Rev. 103, 105 (1960).  "If death, insolvency, or sale were to close up vast mining enterprises, in which many persons and large interests participate, it would entail disastrous consequences."  *Childers v. Neely*, 47 W.Va. at 74, 34 S.E. at 829.[21]

---

[21] In *Kahn v. Central Smelting Co.*, 102 U.S. 641, 645-46 (1880), the U.S. Supreme Court noted the unique problems of applying *delectus personae* to mining enterprises:

(continued . . .)

23

Hence, members of a mining partnership may come and go without forcing the dissolution of the partnership and the interruption of the mining business. Unlike a common-law general partnership, a mining partnership "is not terminated by the death, lunacy, or bankruptcy of a partner, nor by the transfer of his interest to a stranger."[22]

---

Associations for working mines are generally composed of a greater number of persons than ordinary trading partnerships; and it was early seen that the continuous working of a mine, which is essential to its successful development, would be impossible, or at least attended with great difficulties, if an association was to be dissolved by the death or bankruptcy of one of its members, or the assignment of his interest. A different rule from that which governs the relations of members of a trading partnership to each other was, therefore, recognized as applicable to the relations to each other of members of a mining association. The *delectus personae*, which is essential to constitute an ordinary partnership, has no place in these mining associations. There are other consequences resulting from this peculiarity of a mining partnership, particularly as to the power of individual members to bind the association, upon which there is no occasion now to express any opinion.

[22]Syllabus Point 3, *Childers v. Neely*, 47 W.Va. at 70, 34 S.E. at 828 ("A sale of his interest by a member of a mining partnership to another member or a stranger does not dissolve the partnership, as in ordinary partnerships."); Syllabus Point 1, *Blackmarr v. Williamson*, 57 W.Va. at 249, 50 S.E. at 254 ("One of the partners in a mining partnership may convey his interest in the mine and business without dissolving the partnership."); *Wetzel v. Jones*, 75 W.Va. 271, 275, 84 S.E. 951, 952 (1914) ("Though a sale or assignment by one member effects a dissolution of a general partnership, it does not have that effect on a mining partnership."); Syllabus Point 1, *Park v. Adams*, 114 W.Va. 730, 173 S.E. 785 (1934) ("A mining partnership is not terminated by the death of a partner").

One commentator noted that "the mining partnership resembles the tenancy in common, in that one associate may transfer his interest in the common property, placing the transferee in the same position, in relation to the others, as he himself was before the transfer." Lester C. Hess, "Student Note: Mining Partnerships: Power of One

(continued . . .)

Stephen Ailes, "Student Note: Mining Partnerships in West Virginia," 41 W.Va.L.Q. 144, 145 (1934).  Put concisely, "a mining partner relationship continues until the time the mine or the lease ceases its existence, since this relationship's very nature involves the existence of a mine."  Kiesling, 12 Baylor L. Rev. at 106.

Second, a mining partnership may form without any express agreement between the members of the association.  While a mining partnership "may be the product of a formal agreement," Brimmer, 15 Rocky Mtn. Min. L. Inst. at 4, it can also be created purely by operation of law, inferring a partnership from the conduct of the parties. A mining partnership "arises by operation of law when cotenants of mining lands unite and cooperate for the purpose of extracting minerals, whether coal, oil or gas from the land."  Ailes, 41 W.Va. L.Q. at 144.  *Accord*, *Wagner Supply Co. v. Bateman*, 118 Tex. 498, 505, 18 S.W.2d 1052, 1055 (1929) ("The rule is that a mining partnership arises by operation of law where co-owners work a mine.").  "Mere co-working makes them partners, without special contract."  *Childers v. Neely*, 47 W.Va. at 73, 34 S.E. at 829. "In fact, even an express contract provision stipulating that the parties do not intend to form a mining partnership will be held immaterial, if in fact their acts and conduct constitute that relationship as a matter of law."  Brimmer, 15 Rocky Mtn. Min. L. Inst. at 4 (citing *Meister v. Farrow*, 92 P.2d at 760 ("the action of the parties . . . creates all of the elements of a mining partnership").

Partner to Bind other Partners in Dealings With Third Persons," 34 W.Va. L.Q. 199, 200 (1927).

Finally, and most important to the instant case, is the issue of shared ownership of the real estate being mined. While a common law general partnership cannot arise solely by sharing ownership of property, shared ownership is the keystone of a mining partnership. "It is well settled that a mining partnership cannot exist in the absence of co-ownership of a mineral interest. Some form of concurrent ownership is an indispensable requisite." Brimmer, 15 Rocky Mtn. Min. L. Inst. at 4.

A common law mining partnership cannot exist without there being two or more people sharing ownership of a mineral interest. Some form of concurrent ownership is an indispensable requisite. Whether a fee simple title to an entire tract or a lease of one seam of one mineral below the surface, the members of a mining partnership share ownership of the mineral rights. As we stated in one of our earliest cases defining mining partnerships, "Ownership of shares or interests in the mine is an essential element of a mining partnership." *Blackmarr v. Williamson*, 57 W.Va. at 253, 50 S.E. at 256. Our other cases similarly have required partners of a mining partnership to have an ownership interest in the minerals. *See*, Syllabus Point 1, *Childers v. Neely*, 47 W.Va. at 70, 34 S.E. at 828 ("Where tenants in common or joint tenants of an oil lease or mine unite and co-operate in working it, they constitute a mining partnership."); Syllabus Point 1, *Wetzel v. Jones*, 75 W.Va. 271, 84 S.E. 951 (1914) ("Where joint owners of an oil and gas lease unite in operating the demised premises thereunder, without any special agreement as to the character of their relation to each other, they constitute a mining partnership."); Syllabus Point 1*, Manufacturers Light & Heat Co. v. Tenant*, 104 W.Va. at 221, 139 S.E. at 706 ("While co-owners or joint owners of a mining lease, before they

26

operate for oil or gas, are tenants in common or joint tenants, when they unite and co-operate in working the lease, they constitute a mining partnership.").

To be clear, however, a mining partnership does not arise simply by reason of two or more people having a cotenancy or co-ownership of an interest in minerals. Instead, a mining partnership "arises only when the co-owners or cotenants unite in working the same for the purpose of extracting mineral therefrom." John P. Gray, "Mining Partnerships," 3 Wis. L. Rev. 13 (1924). "Until the ground is worked . . . [t]he owners are merely cotenants and their rights and duties are to be determined as such." *Id.* at 15. "If two or more owners of a mine unite in working it, without any partnership agreement, the act of working it together creates a mining partnership; and the same is true of two or more holding interests in a lease of mining property." Syllabus Point 1, *Kirchner v. Smith*, 61 W.Va. 434, 58 S.E. 614 (1907). "Cessation of the firm's business will return the parties to the status of" cotenants or co-owners of the mineral estate. Ailes, 41 W.Va. L.Q. at 146.

We now turn to the question certified by the Court of Appeals, but rephrase the question (pursuant to our authority to do so).[23] The Court of Appeals asks this:

> Whether the proponent of his own working interest in
> a mineral lease may prove his entitlement thereto and enforce
> his rights thereunder by demonstrating his inclusion within a

---

[23] "When a certified question is not framed so that this Court is able to fully address the law which is involved in the question, then this Court retains the power to reformulate questions certified to it under . . . the Uniform Certification of Questions of Law Act found in W.Va. Code, 51-1A-1, *et seq.*[.]" Syllabus Point 3, in part, *Kincaid v. Mangum*, 189 W.Va. 404, 432 S.E.2d 74 (1993).

27

mining partnership, without resort to proof that the lease interest has been conveyed to him by deed or will or otherwise in strict conformance with the Statute of Frauds.

Our thorough examination of the common law leads us to the firm conclusion that each member of a mining partnership must hold an ownership interest in the mineral estate that is being mined. Because a mineral interest is an estate in lands which "may be taken, destroyed, or consumed," any ownership interest in a mineral estate must be created or conveyed by a deed, will, or similar written conveyance under the Statute of Frauds. *See* Syllabus Point 1, in part, *McCullough Oil, Inc. v. Rezek*, 176 W.Va. 638, 346 S.E.2d 788 (1986) ("An oil and gas lease (or other mineral lease) is . . . a conveyance[.]"); Syllabus Point 2, *Lawson v. Kirchner*, 50 W.Va. 344, 40 S.E. 344 (1901) ("An oil lease for oil and gas purposes is a conveyance or sale of an interest in land conditional and contingent on the discovery and reduction to possession of the oil or gas.").

We therefore conclude that, for a person to establish an ownership interest in a mining partnership, the Statute of Frauds requires that the person show their interest was created or conveyed by a deed, will, or similar written conveyance. *See W.Va. Code* § 36-1-1.

## B. General Partnerships

The second part of Judge King's "chicken-or-the-egg" certified question essentially asks this: if Valentine is not a member of a mining partnership, but is simply a member of a general partnership that owns and operates oil and gas wells under a mineral

28

lease, then is Valentine required by the Statute of Frauds to produce a written instrument

showing he is a partner in the general partnership? The answer is buried in West

Virginia's statutes, and is unequivocally "no."

The *West Virginia Revised Uniform Partnership Act*, or "RUPA," defines a

partnership as:

> an association of two or more persons to carry on as coowners
> a business[24] for profit formed under section two, article two
> of this chapter, predecessor law, or comparable law of another
> jurisdiction . . .

*W.Va. Code* § 47B-1-1(7) [2003]. Likewise, RUPA states that, generally, a partnership is

formed in the following way:

> the association of two or more persons to carry on as
> coowners a business for profit forms a partnership, whether or
> not the persons intend to form a partnership.

*W.Va. Code* § 47B-2-2(a) [1995].[25] Under this definition, people operating a business

together for profit "may inadvertently create a partnership despite their expressed

---

[24] The RUPA states that a "'Business' includes every trade, occupation and profession." *W.Va. Code* § 47B-1-1(1).

[25] Somewhat confusingly, *W.Va. Code* § 47B-2-2(b) provides that, "An association formed under a statute other than this chapter, a predecessor statute, or a comparable statute of another jurisdiction is not a partnership under this chapter." The Official Comments to the Revised Uniform Partnership Act clarifies the meaning of this statute:

> Subsection (b) provides that business associations organized
> under other statutes are not partnerships. Those statutory
> associations include corporations, limited partnerships, and
> limited liability companies. That continues the [now-repealed
> Uniform Partnership Act] concept that general partnership is

(continued . . .)

29

subjective intention not to do so."   Allan Donn, Robert W. Hillman, & Donald J. Weidner, *The Revised Uniform Partnership Act*, § 202, Official Comments (Thompson Reuters 2014) [hereinafter Donn, *Revised Uniform Partnership Act*].   If there is any agreement governing a partnership, it may be written, oral, or implied.  *W.Va. Code* § 47B-1-1(8).[26]

The West Virginia Legislature adopted RUPA in 1995, and stated that RUPA "governs all partnerships" in existence before, on, or after July 1, 1995.  *W.Va. Code* § 47B-11-4 [1996].[27]   RUPA is a "gap filler" in that it only governs partnership

---

the residual form of for profit business association, existing only if another form does not.

Allan Donn, Robert W. Hillman, & Donald J. Weidner, *The Revised Uniform Partnership Act*, § 202, Official Comments (Thompson Reuters 2014).

[26] RUPA broadly defines a partnership agreement in *W.Va. Code* § 47B-1-1(8):

"Partnership agreement" means the agreement, whether written, oral or implied, among the partners concerning the partnership, including amendments to the partnership agreement.

[27] The Official Comments to the Revised Uniform Partnership Act suggest that the model statute pertaining to the applicability of the Act "provides for a transition period in the applicability of the Act to existing partnerships," allowing partnerships several years to adjust to the new law before it "becomes mandatory for all partnerships[.]"   Donn, *Revised Uniform Partnership Act*, § 1206.   When the West Virginia Legislature adopted RUPA, it effectively eliminated the transition period and made the Act applicable to all partnerships on July 1, 1995.

affairs when there is no partnership agreement, or to the extent a partnership agreement does not otherwise provide.[28] *West Virginia Code* § 47B-1-3(a) [1995] provides that:

> relations among the partners and between the partners and the partnership are governed by the partnership agreement. To the extent the partnership agreement does not otherwise provide, this chapter governs relations among the partners and between the partners and the partnership.[29]

RUPA's "underlying philosophy differs radically" from the common law and prior statutes, "thus laying the foundation for many of its innovative measures." *Shoemaker v. Shoemaker*, 275 Neb. 112, 125, 745 N.W.2d 299, 309 (2008). Key among these innovative measures is that RUPA adopts the "entity" theory of partnership as opposed to the "aggregate" theory that previously applied.

> Under the aggregate theory, a partnership is characterized by the collection of its individual members, with the result being that if one of the partners dies or withdraws, the partnership ceases to exist. On the other hand, RUPA's entity theory allows for the partnership to continue even with the departure of a member because it views the partnership as "an entity distinct from its partners."

*Id.*, 275 Neb. at 125, 745 N.W.2d at 309-10. A leading treatise on RUPA best summarizes the distinction between the aggregate and entity theories of partnership:

---

[28] *See Creel v. Lilly*, 354 Md. 77, 91, 729 A.2d 385, 393 (1999) ("RUPA is a 'gap filler' in that it only governs partnership affairs to the extent not otherwise agreed to by the partners in the partnership agreement."); Donn, *Revised Uniform Partnership Act*, § 103, Official Comments ("To the extent that the partners fail to agree upon a contrary rule, RUPA provides the default rule.").

[29] We note, however, that *W.Va. Code* § 47B-1-3(b) contains various rights and duties (such as the duties of care, good faith, and fair dealing) that cannot be varied, altered, unreasonably reduced or restricted, or eliminated by a partnership agreement.

> The aggregate theory traditionally applied by the common law courts does not regard the partnership as an organization with a separate legal personality. The aggregate approach views the partnership as nothing more than a conduit for a collection of individuals. Each partner is seen as owning an undivided share of partnership assets and as conducting a pro rata share of partnership business. The entity theory, on the other hand, treats the partnership as a distinct entity interposed between partners and partnership assets. The partner's interest is viewed as a separate bundle of rights and liabilities associated with the partner's participation in the organization, analogous to the interest of a corporate shareholder in shares of stock.

Donn, *Revised Uniform Partnership Act*, § 201. This new philosophy is bluntly expressed in *West Virginia Code* § 47B-2-1 [1995]: "A partnership is an entity distinct from its partners."

This philosophical distinction is important to understanding property owned by partnerships. Under the entity theory, "Partners are no longer conceived of as co-owners of partnership property. Rather, the partnership entity owns partnership property." Donn, *Revised Uniform Partnership Act*, § 203. "Even property that is contributed by partners becomes property of the entity rather than property of a cotenancy of the contributing partners." *Id.*

In light of the entity theory, RUPA provides the following rule for the ownership of property by a partnership:

> Property acquired by a partnership is property of the partnership and not of the partners individually.

*W.Va. Code* § 47B-2-3 [1995]. "[I]f property has become partnership property, the individual partners no longer have a direct interest in it." Donn, *Revised Uniform Partnership Act*, § 204.[30]

---

[30] *West Virginia Code* § 47B-2-4 [1995] defines situations in which property will be deemed partnership property, but ultimately the question involves the "objective manifestations of intent" by the partners. Donn, *Revised Uniform Partnership Act*, § 204. The statute provides:

>      (a) Property is partnership property if acquired in the name of:
>
>      (1) The partnership; or
>
>      (2) One or more partners with an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership but without an indication of the name of the partnership.
>
>      (b) Property is acquired in the name of the partnership by a transfer to:
>
>      (1) The partnership in its name; or
>
>      (2) One or more partners in their capacity as partners in the partnership, if the name of the partnership is indicated in the instrument transferring title to the property.
>
>      (c) Property is presumed to be partnership property if purchased with partnership assets, even if not acquired in the name of the partnership or of one or more partners with an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership.
>
>      (d) Property acquired in the name of one or more of the partners, without an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership and without use of

(continued . . .)

In this case, Valentine asserts that he did not purchase a direct ownership interest in real estate. Instead, he argues that Frank "F.A." Deem sold him an ownership interest in four general partnerships, and that it was the general partnerships which owned the real estate interests. Valentine asserts there was substantial evidence to support a finding that he was a member of the four partnerships, that the leases were owned and operated by the four partnerships, and that he was therefore entitled to share in the profits generated by those leases.

The Court of Appeals precisely assessed that the question that needed to be resolved was whether Valentine needed a writing conforming to the Statute of Frauds to show his ownership interest in the general partnerships that owned the mineral leases.

Neither of the parties has produced any evidence of partnership agreements for the four partnerships, so their relations are governed by RUPA. Under RUPA, any property given to or acquired by the four partnerships (whether real or personal property) "is property of the partnership[s] and not of the partners individually." *W.Va. Code* § 47B-2-3. Accordingly, any interest in the mineral estates would be owned by the four partnerships, and not by the individual partners such as Valentine or Sugar Rock. Hence, Valentine need only establish that he is a member of each of the four partnerships, and there is no requirement under the Statute of Frauds that he produce a deed, will, or other written instrument to establish he was granted a partnership interest in the partnership.

---

partnership assets, is presumed to be separate property, even if used for partnership purposes.

34

To be clear, this was also the rule under the common law. When a partnership owns real estate, it is a well-established rule that the Statute of Frauds could not be applied between partners. As we said in Syllabus Point 2 of *Lantz v. Tumlin*, 74 W.Va. 196, 81 S.E. 820 (1914),[31]

> Where persons associate themselves together in a joint enterprise for profit, either as partners or otherwise, a relationship of trust and confidence is thereby established, and thereafter as between them in the conduct of the joint or partnership business the statute of frauds is inapplicable.[32]

---

[31] *Lantz v. Tumlin* contains several references that the two parties were seeking the "winding up and settlement of a mining partnership[.]" 74 W.Va. at 196, 81 S.E. at 820. However, the facts indicate that one party purchased the mineral interest and "took the deed for the property in his individual name." It therefore appears that the parties in *Lantz v. Tumlin* did not form a "mining partnership," but rather a general partnership with its primary business being the purchase, ownership and operation of a mineral interest.

[32] *See also*, Syllabus Point 3, *Currence v. Ward*, 43 W.Va. 367, 27 S.E. 329 (1897) ("Neither an express nor constructive trust in lands need be created, declared, or proven in writing in this State, but may be shown by oral evidence."); Syllabus Points 2 and 5, *Bond v. Taylor*, 68 W.Va. 317, 69 S.E. 1000 (1910) ("Where two or more persons, as partners in fact or otherwise, engage in a joint enterprise to buy land or the timber thereon for sale and profit the relationship of trust and confidence is thereby established, requiring good faith and fair dealings between the parties. . . . In such cases of express trust the statute of frauds is inapplicable"); Syllabus Point 1, *Floyd v. Duffy*, 68 W.Va. 339, 69 S.E. 993 (1910) ("Creations and declarations of trusts in lands may be made and proved in this state as they could be in England, before the English Statute of Frauds, the seventh section of that statute, requiring the proof of such creations and declarations to be in writing, never having been in force in this state."); "Applicability of Statute of Frauds to joint adventure or partnership to deal in real estate," 18 A.L.R. 484 (1922) ("[T]he decided weight of authority is to the effect that a parol partnership agreement, or joint enterprise, entered into by two or more persons for the purpose of carrying on the business of purchasing and selling real estate, or interests therein, for speculation, the profits to be divided among the parties, is not within the provisions of the Statute of Frauds relating to the sale of land or an interest in lands; in other words, that such an agreement may be entered into and become effectual, although not in writing.");

(continued . . .)

35

In other words, an oral partnership agreement to carry on a business that buys, owns, and/or sells real estate is enforceable and is not within the Statute of Frauds. "[A] partnership interest – regardless of the nature of the partnership's assets – is personalty, not realty. Indeed, if the legal characterization of a partnership interest depended on the nature of the partnership's assets, that characterization might change every time the

"Applicability of Statute of Frauds to joint adventure or partnership to deal in real estate," 95 A.L.R. 1242 (1935) (same).

Other states also view real estate owned by a partnership as personal property, not subject to the Statute of Frauds, so as to facilitate property division during dissolution. *See*, *e.g.*, *In re Estate of Maggio*, 193 Vt. 1, 17, 71 A.3d 1130, 1141 (2012) ("a transfer of a partner's interest in a partnership, including an interest in a partnership that owns real property, is not subject to the Statute of Frauds"); *Turley v. Ethington*, 213 Ariz. 640, 645-46, 146 P.3d 1282, 1287-88 (Ct. App. 2006) ("the statute of frauds has no practical application to agreements governed by the RUPA."); *Forward v. Beucler*, 702 F.Supp. 582, 585 (E.D.Va.1988) ("[E]nforceability of an oral promise to transfer a limited partnership interest is not barred by the statute of frauds even if the partnership's sole asset is real property. . . . [P]artnership interests are personalty whatever the nature of the partnership assets."); *Beach v. Anderson*, 417 N.W.2d 709, 712-13 (Minn.Ct.App.1988) (stipulation to transfer partnership interest was an agreement to transfer personalty and therefore not subject to Statute of Frauds, even though partnership owned real property); *Malaty v. Malaty*, 95 A.D.3d 961, 962, 944 N.Y.S.2d 591, 593 (2012) ("The statute of frauds does not render void oral joint venture agreements to deal in real property, as the interest of each joint venturer in a joint venture is deemed personalty."); *Wirth v. Sierra Cascade, LLC*, 234 Or.App. 740, 769, 230 P.3d 29, 45 (2010) (the Statute of Frauds does not apply to agreements to transfer property "from partner to partnership" or "from partner to partner, on behalf of the partnership"); *Turley v. Ethington*, 213 Ariz. 640, 647, 146 P.3d 1282, 1289 (Ariz. Ct. App. 2006) (because the Revised Uniform Partnership Act allows constructive trusts to be used to remedy breaches of partnership fiduciary duty, court refused "to apply the statute of frauds to contracts for the conveyance of real property between and among partners and partnerships."); *Potter v. Homestead Preservation Ass'n*, 330 N.C. 569, 577, 412 S.E.2d 1, 6 (1992) ("A partner's interest in partnership assets—including real property—is a personal property interest. As such, it is not subject to the statute of frauds.").

partnership acquired or disposed of assets. The legal chaos inevitably flowing from such a rule of law was surely not intended" when the Legislature adopted RUPA. *Forward v. Beucler*, 702 F.Supp. 582, 586-87 (E.D. Va. 1988).

We therefore conclude that, under RUPA, a partnership interest – regardless of the nature of the partnership's assets – is personal property, not real property. The Statute of Frauds is therefore inapplicable to the relationship between partners, and does not require that a partnership interest in the partnership be proven by a written instrument.

## IV.
## CONCLUSION

We answer the question posed by the Court of Appeals, as reformulated, in two parts. We conclude that the Statute of Frauds requires the partners of a mining partnership to show their membership through a deed, will, or other written conveyance establishing they are co-owners of the mineral interest being mined. However, because the real property of a general partnership belongs to the partnership entity and not the individual partners, no such writing is required to establish a partnership interest in a general partnership.

Certified Question Answered.