# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

**January 2020 Term**

_____

No. 18-1034

_____

**FILED**

**June 15, 2020**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**NORTHEAST NATURAL ENERGY LLC,
and NNE WATER SYSTEMS LLC,**
**Defendants Below, Petitioners**

**v.**

**PACHIRA ENERGY LLC,**
**Plaintiff Below, Respondent**

_____

**Appeal from the Circuit Court of Monongalia County
The Honorable Russell M. Clawges, Judge
Civil Action No. 18-C-369**

**AFFIRMED**
_____

**Submitted: January 28, 2020
Filed: June 12, 2020**

Ancil G. Ramey, Esq.
Steptoe & Johnson PLLC
Huntington, West Virginia
Charles F. Johns, Esq.
Kylie D. Barnhart, Esq.
Steptoe & Johnson PLLC
Bridgeport, West Virginia
Counsel for the Petitioner

Jeffrey C. King, Esq.
K&L Gates LLP
Fort Worth, Texas
Jared S. Hawk, Esq.
Katherine M. Gafner, Esq.
K&L Gates LLP
Pittsburgh, Pennsylvania
Frank E. Simmerman, Jr., Esq.
Chad L. Taylor, Esq.
Frank E. Simmerman, III, Esq.
Simmerman Law Office, PLLC
Clarksburg, West Virginia
Counsel for the Respondent

**JUSTICE HUTCHISON delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.      "West Virginia Constitution, article VIII, section 3, which grants this Court appellate jurisdiction of civil cases in equity, includes a grant of jurisdiction to hear appeals from interlocutory orders by circuit courts relating to preliminary and temporary injunctive relief."  Syllabus Point 2, *State ex rel. McGraw v. Telecheck Servs., Inc*., 213 W. Va. 438, 582 S.E.2d 885 (2003).

2.      "In reviewing the exceptions to the findings of fact and conclusions of law supporting the granting of a temporary or preliminary injunction, we will apply a three-pronged deferential standard of review. We review the final order granting the temporary injunction and the ultimate disposition under an abuse of discretion standard, *West v. National Mines Corp.,* 168 W.Va. 578, 590, 285 S.E.2d 670, 678 (1981), we review the circuit court's underlying factual findings under a clearly erroneous standard, and we review questions of law de novo. Syllabus Point 4, *Burgess v. Porterfield,* 196 W.Va. 178, 469 S.E.2d 114 (1996)."  Syllabus Point 1, *State By & Through McGraw v. Imperial Mktg*., 196 W. Va. 346, 472 S.E.2d 792 (1996).

3.      "The granting or refusal of an injunction, whether mandatory or preventive, calls for the exercise of sound judicial discretion, in view of all the circumstances of the particular case; regard being had to the nature of the controversy, the object for which the injunction is being sought, and the comparative hardship or convenience to the respective parties involved in the award or denial of the writ."  Syllabus Point 4, *State v. Baker*, 112 W. Va. 263, 164 S.E. 154 (1932).

**HUTCHISON, Justice**:

In this appeal from the Circuit Court of Monongalia County, we are asked to examine a circuit court's order granting a preliminary injunction. The circuit court found that the plaintiff below had a likelihood of succeeding on the merits of its underlying claims and found that the plaintiff was likely to suffer irreparable harm in the absence of the injunction. The defendant below challenges these findings.

As we discuss below, we find no error in the circuit court's preliminary injunction order. Accordingly, we affirm the circuit court's decision.

## I. Factual and Procedural Background

In 2011, plaintiff Pachira Energy LLC ("Pachira") entered into an agreement with defendant Northeast Natural Energy LLC ("Northeast"). The agreement established the Blacksville Area of Mutual Interest ("Blacksville AMI") and set forth guidelines for exploiting oil and gas leases and other mineral interests in an area encompassing parts of Monongalia County, West Virginia, and Greene County, Pennsylvania. Pachira and Northeast agreed that all jointly-held leases within the Blacksville AMI would be developed with Northeast owning a 75% working interest and Pachira owning a 25% working interest. The parties subsequently entered into a Joint Operating Agreement to operate natural gas wells on the leased lands, and again agreed to split costs and profits using the same 75%/25% ratio.

1

At some later point, Pachira and Northeast entered into an oral agreement to develop and operate a water system. This system was originally designed to efficiently transport water from Dunkard Creek, a stream within the Blacksville AMI, for use in the drilling and hydraulic fracturing ("fracking") of wells within the Blacksville AMI. The parties agree that there is no written agreement governing the construction, operation, or maintenance of the water lines and facilities. Despite no such formal agreement, Pachira and Northeast jointly shared the costs of the water system using the same 75%/25% ratio previously used in the Blacksville AMI agreement and the Joint Operating Agreement.[1]

It appears that at some point in 2018, defendant Northeast began a separate venture: the construction of the "Monongahela River Trunk Line," a water line from the Monongahela River to the Blacksville AMI. Northeast constructed the trunk line at its own expense. Pachira has no ownership interest in the trunk line and paid nothing for the costs of construction, operation, or maintenance. However, Pachira paid for 25% of the costs of an extension line connecting the Blacksville AMI water system to the Monongahela River Trunk Line, while Northeast paid the remaining 75%.

In mid-2018, Northeast informed Pachira that it intended to charge Pachira its 25% share of $0.50 per barrel for water transported through the Monongahela River Trunk Line to the boundary of the Blacksville AMI. Then, in September 2018, Northeast

---

[1] Northeast subsequently assigned its interest in the water lines and facilities to an affiliate, defendant NNE Water Systems LLC. For simplicity, we will hereafter refer to NNE Water Systems LLC jointly with its parent, Northeast.

began testing on the Monongahela River Trunk Line, intending to use water from the Monongahela River rather than Dunkard Creek to develop wells within the Blacksville AMI.

However, Pachira had learned that Northeast also intended to use the jointly-owned Blacksville AMI water system to transport water from the Monongahela River and through the Blacksville AMI to wells in southern Pennsylvania. These Pennsylvania wells were outside the Blacksville AMI and were owned, in whole or in part, by Northeast. Pachira had no interest in the wells that Northeast sought to supply. Furthermore, Pachira learned that Northeast intended to use the Blacksville AMI water system to transport and sell Monongahela River water to third parties for use outside of the Blacksville AMI.

On September 11, 2018, Pachira filed a complaint against Northeast generally alleging that Northeast was breaching various agreements and was abusing its power to benefit itself to the detriment of Pachira. Among its various requests for relief, Pachira sought a permanent injunction to stop Northeast's use of the jointly-owned water system within the Blacksville AMI to support Northeast's drilling operations outside the Blacksville AMI, and to sell water to third parties for use outside of the Blacksville AMI.

Contemporaneously, Pachira filed an emergency motion asking the circuit court for a preliminary injunction and an expedited hearing. Until the underlying dispute could be resolved, Pachira asked the court to temporarily enjoin Northeast from using the Blacksville AMI water system to transport water to locations outside of the Blacksville

3

AMI, or to sell water to third parties for use outside of the Blacksville AMI.[2] The circuit court conducted a hearing on September 19, 2018, and thereafter received documents from the parties answering questions raised by the circuit court during the hearing.

In an order entered October 25, 2018, the circuit court granted Pachira's motion for a preliminary injunction. The circuit court found that Pachira was likely to succeed in proving its claims, and had shown it was likely to suffer immediate and irreparable harm before the court would be able to issue a final ruling on Pachira's request for a permanent injunction. The circuit court enjoined Northeast from using the water system inside of the Blacksville AMI to transport water to locations outside of the Blacksville AMI, and enjoined Northeast from using the water system to transport and sell water to third parties for use outside of the Blacksville AMI.

Northeast now appeals the circuit court's preliminary injunction order.

## II. Standard of Review

The order under appeal is not a final order and, typically, this Court will not review such an interlocutory order. However, in Syllabus Point 2 of *State ex rel. McGraw v. Telecheck Servs., Inc.*, 213 W. Va. 438, 582 S.E.2d 885 (2003), we held that "*West*

[2] Pachira also asked the circuit court to enjoin Northeast from using the Blacksville AMI water system to import water from sources outside the Blacksville AMI (that is, water from the Monongahela River Trunk Line at a cost of $0.50 per barrel), and using that water to develop and operate wells jointly controlled by the parties within the Blacksville AMI. The circuit court denied this part of Pachira's motion for a preliminary injunction, and neither party appeals this portion of the circuit court's order.

*Virginia Constitution,* article VIII, section 3, which grants this Court appellate jurisdiction of civil cases in equity, includes a grant of jurisdiction to hear appeals from interlocutory orders by circuit courts relating to preliminary and temporary injunctive relief."

We apply the following deferential standards for reviewing an order granting a preliminary injunction:

> In reviewing the exceptions to the findings of fact and conclusions of law supporting the granting of a temporary or preliminary injunction, we will apply a three-pronged deferential standard of review. We review the final order granting the temporary injunction and the ultimate disposition under an abuse of discretion standard, . . . we review the circuit court's underlying factual findings under a clearly erroneous standard, and we review questions of law de novo.

Syllabus Point 1, *State By & Through McGraw v. Imperial Mktg.*, 196 W. Va. 346, 472 S.E.2d 792 (1996) (citations omitted).

## III. Discussion

Northeast contends that the circuit court erred in granting Pachira a preliminary injunction. We have articulated the following standard for circuit courts weighing motions seeking injunctive relief:

> The granting or refusal of an injunction, whether mandatory or preventive, calls for the exercise of sound judicial discretion, in view of all the circumstances of the particular case; regard being had to the nature of the controversy, the object for which the injunction is being sought, and the comparative hardship or convenience to the respective parties involved in the award or denial of the writ.

Syllabus Point 4, *State v. Baker*, 112 W. Va. 263, 164 S.E. 154 (1932).  In more recent times, we have articulated a clearer alternative standard:

> The customary standard applied in West Virginia for issuing a preliminary injunction is that a party seeking the temporary relief must demonstrate by a clear showing of a reasonable likelihood of the presence of irreparable harm; the absence of any other appropriate remedy at law; and the necessity of a balancing of hardship test including: (1) the likelihood of irreparable harm to the plaintiff without the injunction; (2) the likelihood of harm to the defendant with an injunction; (3) the plaintiff's likelihood of success on the merits; and (4) the public interest.

*Imperial Mktg.*, 196 W. Va. at 352 n.8, 472 S.E.2d at 798 n.8 (citations and quotations omitted).

Northeast contends that Pachira's claims that Northeast is "trespassing" upon or "misusing" the water system are fundamentally unsound, and therefore that the circuit court erred in finding Pachira had established that there was a likelihood of success on the merits of its claims.  Northeast concedes that it jointly owns the water system with Pachira.  Northeast, however, argues that the companies share the water system as tenants in common, because each party owns a separate fractional share of undivided property.  As tenants in common, it is Northeast's position that each tenant is "equally entitled to the use, occupancy, enjoyment, and possession of the common property."  86 C.J.S. *Tenancy in Common* § 21 (2018).  Northeast argues that it shares ownership of the water system, and that is impossible for it to trespass on its own property.

6

Northeast also asserts that when applying the above-stated guidelines for injunctive relief, the circuit court erred in finding Pachira was likely to suffer irreparable harm. "We have uniformly held that in order to obtain a preliminary injunction, a party must demonstrate the presence of irreparable harm." *Jefferson Cty. Bd. of Educ. v. Jefferson Cty. Educ. Ass'n*, 183 W. Va. 15, 24, 393 S.E.2d 653, 662 (1990). Northeast argues that Pachira essentially argued to the circuit court that a preliminary injunction was needed to preserve the status quo and to stop Northeast from misusing the water system in the future. As this Court has found, "[i]njunctive relief, like other equitable or extraordinary relief, is inappropriate when there is an adequate remedy at law." *Hechler v. Casey*, 175 W. Va. 434, 440, 333 S.E.2d 799, 805 (1985). Northeast insists that not only is Pachira unlikely to win on the merits of its claims, but that even if Pachira does win, then it can be compensated with an adequate remedy at law: money damages.

We reject Northeast's position because, as we discuss below, the language of the West Virginia Uniform Partnership Act ("Partnership Act") supports the circuit court's conclusion that Pachira is likely to succeed in its claims. *See* W. Va. Code § 47B-1-1 *et seq.* The evidence presented below indicates that Pachira and Northeast are, in fact, partners in a partnership, and that the Blacksville AMI water system is partnership property. The evidence also supports the conclusion that Northeast is using that partnership property for personal gain, to the future detriment of both the partnership and its partner, Pachira. Hence, we find the record supports the circuit court's conclusion that Pachira will suffer an irreparable harm in the absence of the preliminary injunction.

To begin, the Partnership Act defines a partnership as "an association of two or more persons to carry on as coowners a business for profit[.]" W. Va. Code § 47B-1-1(7) (2003). A partnership is created by "the association of two or more persons to carry on as coowners a business for profit . . . *whether or not the persons intend to form a partnership.*" W. Va. Code § 47B-2-2(a) (1995) (emphasis added). "Under this definition, people operating a business together for profit 'may inadvertently create a partnership despite their expressed subjective intention not to do so.'" *Valentine v. Sugar Rock, Inc.*, 234 W. Va. 526, 540, 766 S.E.2d 785, 799 (2014) (quoting Allan Donn, Robert W. Hillman, & Donald J. Weidner, *The Revised Uniform Partnership Act,* § 202, Official Comments (Thompson Reuters 2014)).[3]

The evidence before the circuit court showed that, in the absence of a written agreement governing the relationship of the parties regarding the water system in the Blacksville AMI, the conduct of the parties may have inadvertently created a partnership to co-own and operate the water system as a business for profit.[4] In other words, Pachira

---

[3] Northeast repeatedly points to language in both the agreement establishing the Blacksville AMI and in the Joint Operating Agreement that specifically provides that Northeast and Pachira are not, by entering those agreements, forming a partnership. We acknowledge the existence of that language but note that Pachira's claims are based on an entirely different agreement: the oral agreement between the parties to construct, operate and maintain the water system. Northeast has provided no evidence that this oral agreement specifically disclaimed the formation of a partnership.

[4] Alternatively, Pachira argued that the water system in the Blacksville AMI could also be characterized as a "joint venture." "[A] partnership relates to general business . . . while [a] joint adventure relates to a single business transaction." *Nesbitt v.*

Continued . . .

8

made a substantial case before the circuit court indicating that the parties formed a water system partnership.

The question remains, however, whether the water system in the Blacksville AMI could be property owned by this partnership. We believe that it could.

The Partnership Act states that "[a] partnership is an entity distinct from its partners." W. Va. Code § 47B-2-1 (1995). Because a partnership is a distinct entity, the Act provides the following rule for the ownership of property by a partnership: "Property acquired by a partnership is property of the partnership and not of the partners individually." W. Va. Code § 47B-2-3 (1995). Under the Partnership Act, "Partners are no longer conceived of as co-owners of partnership property. Rather, the partnership entity owns partnership property." Allan Donn, Robert W. Hillman, Donald J. Weidner, *Rev. Uniform Partnership Act*, § 203 (2019). "Even property that is contributed by partners becomes property of the entity rather than property of a cotenancy of the contributing partners." *Id. See generally*, *Valentine v. Sugar Rock, Inc.*, 234 W. Va. at 541, 766 S.E.2d

---

*Flaccus*, 149 W. Va. 65, 74, 138 S.E.2d 859, 865 (1964). We have defined a joint venture as follows:

> A joint venture or, as it is sometimes referred to, a joint adventure, is an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge. It arises out of a contractual relationship between the parties. The contract may be oral or written, express or implied.

Syllabus Point 2, *Price v. Halstead*, 177 W. Va. 592, 355 S.E.2d 380 (1987).

at 800 (discussing the philosophical underpinnings of property ownership under the Partnership Act). "[I]f property has become partnership property, the individual partners no longer have a direct interest in it." *Id.*, 234 W. Va. at 541, 766 S.E.2d at 800 (quoting Donn, *Rev. Uniform Partnership Act*, § 204).

The Partnership Act provides guidance as to how a partnership – even an accidentally-formed partnership – may acquire property. Paragraphs (a) and (b) of West Virginia Code § 47B-2-4 (1995) outline various ways that partnerships may acquire property in the name of the partnership, or that property may be transferred to the partnership. However, paragraph (c) provides:

> Property is presumed to be partnership property if purchased with partnership assets, *even if not acquired in the name of the partnership* or of one or more partners with an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership.

W. Va. Code § 47B-2-4(c) (emphasis added). Under this paragraph, "property purchased with partnership funds is presumed to be partnership property, notwithstanding the name in which title is held. The presumption is intended to apply if partnership credit is used to obtain financing, as well as the use of partnership cash or property for payment." Donn, *Rev. Uniform Partnership Act* § 204, Official Comments.[5]

---

[5] The presumption created by W. Va. Code § 47B-2-4(c) "is rebuttable. Note that it may not be obvious whether partnership assets have been used to pay for the property. In analyzing the kind of facts that should be shown to rebut the presumption,
Continued . . .

The evidence before the circuit court suggested that both Pachira and Northeast invested significant amounts of money, time, and labor to construct, operate, and maintain the water system in the Blacksville AMI. Even though the water system was not titled in the name of a particular partnership (instead, the system appears to have been titled in the name of Northeast Natural Energy before being transferred to its subsidiary, NNE Water Systems), the water system was constructed using assets pooled by Pachira and Northeast for the purpose of constructing, operating and maintaining a water system to support natural gas production in the Blacksville AMI. On this record, Pachira has a substantial likelihood of establishing that the water system in the Blacksville AMI was partnership property purchased with partnership assets, and not, as Northeast argues, property jointly owned by the parties as tenants in common.

The final question we must address is whether Pachira demonstrated that it was reasonably likely to suffer irreparable harm, harm that could not (as Northeast contends) be compensated by money damages. We again turn to the Partnership Act which plainly provides that Pachira, in its capacity as a partner, has a right to seek equitable, injunctive relief against its co-partner Northeast. The Partnership Act provides that "[a] partner may maintain an action against the partnership or another partner for legal or *equitable* relief[.]" W. Va. § 47B-4-5(b) (emphasis added).

---

care should be taken to distinguish disputes among the partners from disputes with third parties." Donn, *Rev. Uniform Partnership Act* § 204.

11

A partner may bring an action to protect rights and enforce duties created under the Partnership Act. *See* W. Va. Code § 47B-4-5(b)(2)(i). Key to this case is the following duty imposed on every partner: "A partner may use or possess partnership property only on behalf of the partnership." W. Va. Code § 47B-4-1(g). Pachira's suit alleges that Northeast is violating this duty and is using the partnership-owned water system for personal gain, to transport water to its own wells in southern Pennsylvania and to third parties for sale, and not on behalf of the partnership to support wells in the Blacksville AMI.

As to *past* conduct, the Partnership Act says that partners must "account to the partnership and hold as trustee for it any . . . profit or benefit . . . derived from a use by the partner of partnership property[.]" W. Va. Code § 47B-4-4(b)(1). The reason the rule is so clear in the context of past conduct is because, usually, partners and partnerships do not discover past misuse of partnership property "until there is an accounting on liquidation of the partnership." Donn, *Rev. Uniform Partnership Act*, § 501 Authors' Comments, n.15.[6]

Stated differently, as to *past* losses, when a partner misuses partnership property for personal gain and profit, that partner must repay the partnership for the *past*

---

[6] Partners can also be prosecuted for past theft or embezzlement of partnership property, and "can no longer defend on the ground the property was theirs . . . [because W. Va. Code § 47B-5-1] now states that the property is not theirs, it is the partnership's." Donn, *Rev. Uniform Partnership Act*, § 501.

misuse of partnership property. In these instances, cash damages are likely sufficient compensation for the past misconduct; injunctive relief is usually not appropriate because the damage has been done and, if the misconduct will not continue, there is nothing to enjoin.

In the instant case, Pachira is asserting it will suffer irreparable harm caused by *future*, threatened misuse of partnership property. "[T]he term 'irreparable' does not always mean what it seems to signify, that is, a physical impossibility of reparation." *Mullens Realty & Ins. Co. v. Klein*, 85 W. Va. 712, 102 S.E. 677, 680 (1920). West Virginia law is clear that "[e]quity will entertain jurisdiction to prevent a threatened injury[.]" *Summers v. Parkersburg Mill Co.*, 77 W. Va. 563, 88 S.E. 1020, 1021 (1916). An "irreparable injury" is one that is "actual and imminent" and "it is likely that the [past] offensive conduct will recur." 3 N.Y. Practice, Com. Litig. in New York State Courts § 18:9 (4th ed.). *See also*, *Fretz v. Burke*, 247 Cal. App. 2d 741, 744-45 (Ct. App. 1967) ("[A]n injunction may be granted as to past acts if there is evidence that they will probably recur.").

The Partnership Act charges a partner with a fiduciary duty of loyalty to the partnership and to other partners; a breach of this fiduciary responsibility gives rise to a right to injunctive relief. "The relationship between partners is fiduciary, and the highest degree of good faith is required." *Barker v. Smith & Barker Oil & Gas Co.*, 170 W. Va. 502, 509, 294 S.E.2d 919, 926 (1982). Accord *Tomlinson v. Polsley*, 31 W. Va. 108, 5 S.E. 457, 460 (1888) ("it is a violation of good faith for a partner to clandestinely stipulate with

13

third persons for any private and selfish advantage and benefit to himself, exclusive of the partnership."). "The partnership may bring an equitable action in the event of a breach of fiduciary duties by a partner and, in such case, the court may remedy the breach through monetary damages *or injunctive relief*." J. William Callison, Maureen A. Sullivan, *Partnership Law and Practice: General and Limited Partnerships*, Remedies § 12:14 (2019).

As we noted earlier, one duty imposed by the Partnership Act is that "[a] partner may use or possess partnership property only on behalf of the partnership." W. Va. Code § 47B-4-1(g). "Violation of this rule [by a partner making personal use of partnership property] would be a breach of the duty of loyalty under R.U.P.A. Section 404(b)(1)." Rev. Uniform Partnership Act, "Partner's Rights and Duties," Section 401. Restated in the context of West Virginia's Partnership Act, violation of the rule prohibiting a partner's individual use of partnership property for personal gain (W. Va. Code § 47B-4-1(g)) would be a breach of the partner's duty of loyalty W. Va. Code § 47B-4-4(b)(1). In other words, a partner's use or possession of partnership property for personal gain is a breach of the partner's fiduciary duty of loyalty that can support an award of both monetary damages and injunctive relief.

Moreover, courts that have examined this question have found that when a partner intends to misuse partnership property *in the future*, the partner is imposing an irreparable harm on the partnership and the other partners. In such cases, an injunction to prevent the future harm is warranted.

14

An example of a trial court granting a preliminary injunction to prevent a partner's future, personal misuse of partnership property is *Shepard v. Patel*, 2012 WL 6019036 (D. Ariz. Nov. 27, 2012). In *Shepard*, individuals formed a partnership to operate a hotel. One partner (the defendant) began using partnership property to pay himself excessive fees to manage the partnership's hotel; used partnership assets to lease and repair a Mercedes for himself; and disbursed partnership profits to himself for payments he purportedly made on behalf of the partnership (and for which he could produce no receipts). Another partner (the plaintiff) sued to dissolve the partnership and discovered the misuse of property. The plaintiff moved for a preliminary injunction to stop the defendant partner from continuing to dissipate partnership property through self-dealing.

The trial court noted the standard for granting a preliminary injunction, including the requirement that the plaintiff show "a likelihood of irreparable harm in the absence of preliminary relief." The trial court then pointed out that "[a] preliminary injunction properly issues in actions seeking dissolution and accounting of partnerships to maintain the status quo pending adjudication on the merits." 2012 WL 6019036, at *4. This is because "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Hence, "[t]o prevent any further improper disbursements of partnership assets and to ensure an accurate accounting at the time of trial, a preliminary injunction is appropriate and necessary." *Shepard*, 2012 WL 6019036, at *4.

15

The trial court in *Shepard* relied upon a seminal case from California, *Wind v. Herbert*, 186 Cal. App. 2d 276 (Ct. App. 1960). The California court found that a trial court properly issued a preliminary injunction to preserve the status quo and to prevent future misuse of partnership property by one partner. The court explained that the granting of a preliminary injunction "rests largely in the discretion of the trial court," and that the general purpose of a preliminary injunction "is to preserve the status quo until the merits of the action can be determined."

The California court then expansively addressed the requirement of an "irreparable injury," and indicated that when a court examines irreparable harm caused by the future misuse of partnership property, the court can go beyond monetary damages and consider whether a partner should have *the right* to inflict harm on other partners.

> Defendants argue that there was no showing that a preliminary injunction was necessary to prevent "irreparable injury" to the partnership assets. They contend that any conceivable future injury would be readily ascertainable and could be compensated by money damages and that there is no claim that defendants could not respond in damages. However, this argument is without merit.
>
> The concept of "irreparable injury" which authorizes the interposition of a court of equity by way of injunction does not concern itself entirely with injury beyond the possibility of repair or beyond possible compensation in damages. Rather, by definition, an injunction properly issues in any case where it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief. Further, the equitable rule . . . is that: "The term 'irreparable injury' . . . means that species of damages, *whether great or small, that ought not to be submitted to on the one hand or inflicted on the other*." In *Commonwealth v. Pittsburgh & Connelesville R.R. Co.,* 24 Pa. 159, [160 (1854)] the court said . . : "The argument that there is no 'irreparable damage,' would not be so often

16

used by wrongdoers if they would take the trouble to observe that the word 'irreparable' is a very unhappily chosen one, used in expressing the rule that an injunction may issue to prevent wrongs of a repeated and continuing character, or which occasion damages estimable only by conjecture and not by any accurate standard. . . . Besides this, where the right invaded is secured by . . . contract there is generally no question of the *amount* of damages, but simply of the *right*." In the instant case, the wrongs complained of were obviously of "a repeated and continuing character" and the rule stated in the case last cited is clearly apposite.

*Wind v. Herbert*, 186 Cal. App. 2d at 284-85 (cleaned up, emphasis in original).

It is obvious that plaintiff Pachira would have a right to monetary damages from defendant Northeast for the defendant's alleged future misuse of partnership property for personal gain. It is also true that Pachira's future damages may be capable of exacting calculation. However, the question the trial court was being asked was, does Northeast have *the right* to continue causing damages to the partnership and to Pachira in the future? As this Court once noted:

Injunctive relief is designed to meet a real threat of a future wrong or a contemporary wrong of a nature likely to continue or recur. Whether interlocutory or final, injunctive relief is ordinarily preventive or protective in character and restrains actions that have not yet been taken. It is generally not intended to redress, or punish for, past wrongs.

*Bd. of Educ. of Cty. of Taylor v. Bd. of Educ. of Cty. of Marion*, 213 W. Va. 182, 186, 578 S.E.2d 376, 380 (2003).

The case law supports the circuit court's decision to preserve the status quo, and to temporarily halt defendant Northeast's future use of the ostensible partnership's

17

water system for its own personal gain. The circuit court's preliminary injunction was designed to meet a real threat of a future wrong, or a contemporary wrong of a nature likely to continue or recur. While Northeast's future use is probably capable of being reduced to some monetary value, the question is whether the partnership and plaintiff Pachira should be required to submit to having property taken and used without permission. The answer is, obviously, no.

On this record, it was fair for the circuit court to preserve the status quo until the parties resolve the merits of their dispute. The circuit court did not err when it found Pachira was likely to suffer irreparable harm in the absence of action by the court. Accordingly, we find no error in the circuit court's preliminary injunction order.[7]

## IV. Conclusion

The circuit court's October 25, 2018, preliminary injunction order is affirmed.

Affirmed.

---

[7] Northeast raises three other issues on appeal. First, Northeast contends the circuit court erred in relying upon an affidavit proffered by Pachira. Second, Northeast asserts the circuit court failed to clearly identify any public interest impacted by Northeast's conduct. Finally, Northeast argues the circuit court failed to properly weigh the harm caused to Northeast by the injunction. After examining the record, we find no merit to these issues and therefore decline to address them.

18